**Fidel RAMOS, et al., Plaintiffs,**

v.

**Richard D. LAMM, et al., Defendants.**

**Civ. A. No. 77–K–1093.**

United States District Court,
D. Colorado.

March 17, 1982.
As Amended March 26, 1982.

Edwin S. Kahn, Kelly, Haglund, Garnsey & Kahn, Denver, Colo., for plaintiffs.

Tarquin J. Bromley, Asst. Atty. Gen., Denver, Colo., for defendants.

## MEMORANDUM OPINION AND ORDER AWARDING ATTORNEY FEES

KANE, District Judge.

After several years of litigation,[1] this case is now before me on plaintiff's application for attorney fees. Because the current law on attorney fees is unsettled and sometimes contradictory, I will explicate it be-

fore reaching the details of this case. Although I will consider cases from other jurisdictions, I will focus on Tenth Circuit cases because they are controlling.

## I. INTRODUCTION

In the United States the traditional rule has been that attorney fees are not awardable to a prevailing party, absent a specific statute authorizing them. See *Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 247, 95 S.Ct. 1612, 1616, 44 L.Ed.2d 141 (1975).[2] Under this rule the trial court may award attorney fees in the absence of an authorizing statute only in a few specific cases. If a trustee or party recovers a fund for the benefit of himself and others, he may include attorney fees in his costs recoverable from the common fund. See *id.* at 257, 95 S.Ct. at 1621. If a losing party has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons" the prevailing party may be entitled to attorney fees. See *id.* at 258–59, 95 S.Ct. at 1622 (citations omitted). In addition, 28 U.S.C. §§ 1920, 1923 permit the trial court to award some minimal attorney fees.

In the early 1970's many lower federal courts and state courts exercised their traditional equity powers to award attorney fees under the "private attorney general" concept even though there was no statutory authorization for such awards. See S.Rep. No.94–1011, 94th Cong., 2d Sess. at 4, [1976] U.S.Cong. & Ad.News 5908, 5911. In 1975 the supreme court held this practice impermissible, absent express congressional authorization. *Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. at 262, 95 S.Ct. at 1624.

Before the *Alyeska* decision at least 29 federal statutes authorized trial courts to award attorney fees. *Id.* at 260 n.33, 95 S.Ct. at 1623 n.33. Since then the growth in the number of federal attorney fee stat-

---

1. See *Ramos v. Lamm,* 485 F.Supp. 122 (D.Colo.1979), *aff'd in part, vacated in part,* 639 F.2d 559 (10th Cir. 1980), *cert. denied,* 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed. 239 (1981), *on remand,* 520 F.Supp. 1059 (D.Colo.1981).

2. This contrasts the English practice, which allows the trial court to include attorney fees in the costs awarded to a prevailing party. See *Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. at 427 n.18, 95 S.Ct. at 1616 n.18.

utes has been proliferate. Currently, about 120 different federal statutes authorize attorney fee awards.[3] These include an amendment to 42 U.S.C. § 1988, which now authorizes trial courts, in their discretion, to award "a reasonable attorney's fee as part of the costs," in civil rights cases brought under 42 U.S.C. §§ 1981–1986 and under Title XI of the Civil Rights Act of 1964.[4]

## II. THE PREVAILING PARTY

■ Although it is now largely settled in what types of actions a federal trial court may award attorney fees, there is still frequent dispute on when a party is a "prevailing party," as used in the attorney fees statutes. See, e.g., *Lanner v. Wimmer*, 662 F.2d 1349 (10th Cir. 1981) (revising its earlier opinion to order the trial court to reconsider whether plaintiffs were prevailing parties on their civil rights claim). If the parties enter into a consent decree before the trial court issues a final judgment, the plaintiffs will still be deemed to be prevailing parties if "they vindicate rights." *Maher v. Gagne*, 448 U.S. 122, 129, 100 S.Ct. 2570, 2574, 65 L.Ed.2d 653 (1980); *Gurule v. Wilson*, 635 F.2d 782, 791–92 (10th Cir. 1980); *Chicano Police Officer's Association v. Stover*, 624 F.2d 127, 130–31 (10th Cir. 1980).[5] But cf. *Pearson v. Western Electric Co.*, 542 F.2d 1150, 1153 (10th Cir. 1976) (plaintiff who received an arbitration award had not prevailed in court and therefore was not entitled to attorney fees under 42 U.S.C. § 2000e–5(k)).

■ When plaintiffs prevail on some, but not all, of the issues asserted at trial, it is more difficult to calculate the attorney fees to which they are entitled. Plaintiffs' attorneys are entitled to compensation for legal work "reasonably calculated" to promote the clients' interests, even if unsuc-

cessful. *Littlefield v. Deland*, 641 F.2d 729, 733 (10th Cir. 1981); *Gurule v. Wilson*, 635 F.2d at 793–94. On the other hand, plaintiffs' attorneys are not entitled to compensation for work done on issues that were frivolous or brought in bad faith. *Id.* at 794. Nor are they entitled to compensation for work done on "*substantial separate* issues" which plaintiffs raised but upon which they did not prevail. *Id.* (emphasis in original).

■ The attorney fees statutes normally do not distinguish between prevailing plaintiffs and prevailing defendants. In order for a prevailing defendant to receive attorney fees, however, he must demonstrate that plaintiff's action was

frivolous, unreasonable, or groundless, or that plaintiff continued to litigate after it clearly became so.

*Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 422, 98 S.Ct. 694, 700, 54 L.Ed.2d 648 (1978). The Tenth Circuit has not yet clearly specified how trial courts are to apply this test. In *Cottrell v. Newspaper Agency Corp.*, 590 F.2d 836, 839 (10th Cir. 1979), the court summarily affirmed the trial court's finding that plaintiff's action was not frivolous or without foundation and therefore that defendant was not entitled to attorney fees. In *EEOC v. Fruehauf Corp.*, 609 F.2d 434 (10th Cir. 1979), *cert. denied*, 446 U.S. 965, 100 S.Ct. 2941, 64 L.Ed.2d 824 (1980), the court reversed the trial court's award of attorneys fees to the defendant:

There is nothing in the record before us to support the trial court's finding that the action was frivolous from its inception, or that in prosecuting the action EEOC was motivated by something other than good faith, presumably bad faith.

3. For a current listing of federal attorney fee statutes see Appendix A of this opinion. The Colorado legislature has ignited its own attorney fee explosion. Approximately 90 Colorado statutes currently authorize attorney fee awards. See Appendix B.

4. 42 U.S.C. §§ 2000a–3(b), 2000e–5(k) already authorized attorney fee awards in cases

brought under Titles II and VII of the Civil Rights Act of 1964.

5. The trial court also may award attorney fees for work done before an administrative agency in a civil rights action. *Booker v. Brown*, 619 F.2d 57, 60–61 (10th Cir. 1980).

*Id.* at 436 (citing *Cottrell*). In *Prochaska v. Marcoux*, 632 F.2d 848, 854 (10th Cir. 1980), *cert. denied*, 451 U.S. 984, 101 S.Ct. 2316, 68 L.Ed.2d 841 (1981), the court reversed the trial court's denial of attorneys fees:

we hold that [plaintiff's] claim was clearly 'frivolous, unreasonable or groundless.'

The Tenth Circuit apparently reached this conclusion because plaintiff's deposition did not establish or reinforce essential allegations in his complaint. The opinion is somewhat curt and does not enunciate what standard of review was being applied to the trial court's factual finding.[6] Judge Doyle dissented, stating that the appellate court should have applied the usual "plain error" standard to the trial court's factual findings. *Id.* at 854–55. Finally, in *Nulf v. International Paper Co.*, 656 F.2d 553, 564 (10th Cir. 1981), the Tenth Circuit reversed the trial court's decision to award the defendant attorney fees. The appellate court again did not enunciate what standard of review it was applying, but apparently independently determined the essential facts. Because the issue of whether an action is frivolous or groundless is a question of fact, it is unclear why the Tenth Circuit does not apply the established "clearly erroneous"[7] standard to trial court findings on that issue.

### III. CALCULATION OF REASONABLE ATTORNEY FEES

After several years of flux, rules on liability for attorney fees are becoming stable. Congress has determined the types of causes of action for which courts may award attorney fees. Standards are beginning to evolve about when a party is entitled to attorney fees under those causes of action.

In contrast, the rules on calculation of attorney fees have remained unsettled. The appellate opinions on this subject are unclear and frequently contradictory. Compare *In re Permian Anchor Services, Inc.*, 649 F.2d 763, 768 (10th Cir. 1981) (attorney fees in bankruptcy proceedings should be determined by applying the standards of *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974)) with *In re King Resources Co.*, No. 80–1301 (10th Cir. April 1, 1981) (not for routine publication) (trial court's award of attorney fees in bankruptcy proceeding reversed without any explicit application of or citation to the *Johnson* criteria). See also *Bowie v. Denver Dept. of Health and Hospitals*, Civil Action No. 78–M–1186 (D.Colo. July 24, 1981) at 7 (Judge Matsch notes the disparities in different Tenth Circuit attorney fee cases and expresses difficulty in "attempting to articulate a comparison" of the attorney fee awards that he has made in different cases).

The Supreme Court has stated that civil rights plaintiffs are ordinarily entitled to attorney fees. *Northcross v. Board of Education*, 412 U.S. 427, 93 S.Ct. 2201, 37 L.Ed.2d 48 (1973) (per curiam); *Newman v. Piggie Park Enterprises, Inc.*, 390 U.S. 400, 402, 88 S.Ct. 964, 966, 19 L.Ed.2d 1263 (1968).[8] In addition, the Tenth Circuit has stated that the trial court must hear evidence on a reasonable attorney fee before making an award. *Francia v. White*, 594 F.2d 778, 782 (10th Cir. 1979). However, neither court has enunciated clear guidelines on the calculation of attorney fees. I therefore find it necessary to summarize the case law on the calculation of attorney fees.

6. Although the appellate court made its own findings of fact, it did not enunciate which of the three adjectives connected by the disjunctive actually described the claim. We are therefore left in the dark on both the standard of review and the actual finding that formed the basis for the appellate decision.

7. See F.R.Civ.P. 52(a):

Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses.

8. Although the civil rights attorney fee statutes state that the trial court "in its discretion, may" award attorney fees, these decisions bring civil rights attorney fee issues closer to the rule in antitrust cases, where the statute states that a successful plaintiff "shall" recover a reasonable attorney fee. 15 U.S.C. § 15.

## A. THE REASONABLENESS OF PARTICULAR AWARDS

In many cases the Tenth Circuit has stated that the award of attorney fees is a matter "particularly within the discretion of the trial court," and then has affirmed the award without any elaboration. See, e.g., *Higgins v. Oklahoma ex. re. Oklahoma Security Comm.*, 642 F.2d 1199, 1203 (10th Cir. 1981); *Colyar v. Third Judicial District Court*, No. 80–1809 (10th Cir. June 22, 1981) (not for routine publication), Slip Opinion at 4 ("From a study of the record, we are satisfied that the award was within the area of reasonableness. If the court considered irrelevant factors in making the award, the error was harmless."); *Milgo Electronic Corp. v. United Business Communications, Inc.*, 623 F.2d 645, 667 (10th Cir.), *cert. denied*, 449 U.S. 1066, 101 S.Ct. 794, 66 L.Ed.2d 610 (1980); *Battle v. Anderson*, 614 F.2d 251, 258–59 (10th Cir. 1980); *EEOC v. Safeway Stores, Inc.*, 597 F.2d 251, 253 (10th Cir. 1979); *Carreathers v. Alexander*, 587 F.2d 1046, 1051–52 (10th Cir. 1978). The Tenth Circuit has also stated that,

> It is, of course, impossible for this court on review to fix an attorney's fee with any degree of accuracy...

*Francia v. White*, 594 F.2d at 782, yet it has vacated and remanded for further consideration attorney fee awards that it thought were inadequate. See, e.g., *Gurule v. Wilson*, 635 F.2d 782, 794 (10th Cir. 1980) (award of $20–$33 per hour seems "parsimonious"); [9] *Francia v. White*, 594 F.2d at 782 (award of $400 "cannot be considered a reasonable fee"); *Campbell v. U.S. Civil Service Commission*, 539 F.2d 58, 62 (10th Cir. 1976) (award of $250 appears "somewhat low"); *Taylor v. Safeway Stores, Inc.*, 524 F.2d 263, 268 (10th Cir. 1975) (award of $17 per hour deemed "modest"). Cf. *Morgan v. Brittany Apartments and Parceners,*

*Ltd.*, No. 79–1230 (10th Cir. Feb. 22, 1980) (not for routine publication), Slip Opinion at 13 ("The [large] magnitude of the allowed fee in the circumstances is also a factor which is bothersome"). These rejected rates cannot be considered impermissible minima, however, because other Tenth Circuit decisions have upheld similarly low awards. See, e.g., *Brito v. Zia Co.*, 478 F.2d 1200, 1204 (10th Cir. 1973) (affirming award of $12 per hour as within trial court discretion); *Barela v. United Nuclear Corp.*, 462 F.2d 149, 155–56 (10th Cir. 1972) (affirming award of $25 per hour as within trial court discretion). So long as the appellate court opinions merely second guess the trial courts, without any articulated basis, and so long as there are not more detailed statutory standards, trial judges will have difficulty making reasonable awards. They must avoid being parsimonious, and yet not be so prodigal as to "make prevailing counsel rich" or to "make the private attorney general's positions so lucrative as to ridicule the public attorney general." See *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 719 (5th Cir. 1974); *Gurule v. Wilson*, 525 F.Supp. 996, 1000 (D.Colo.1981).

## B. METHODS OF CALCULATING REASONABLE AWARDS

Courts most often determine attorney fee awards by adopting some sort of hourly-rate approach at least as a starting point. I will therefore consider some of these approaches. Many, if not most, attorneys in this country are not paid on an hourly basis. I therefore will also consider other approaches to calculating reasonable attorney fees.

### 1. *Johnson v. Georgia Highway Express*

In *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir. 1974), the Fifth Circuit detailed twelve factors [10]

---

9. In *Gurule* the trial judge had followed the attorneys fee standards of the Criminal Justice Act, 18 U.S.C. § 3006A(d), in a prisoner civil rights case. The Tenth Circuit rejected this approach, concluding that congress did not intend for CJA fees to compensate fully appointed attorneys, while § 1988 fees were intended to "attract competent counsel." 635 F.2d at

793. Apparently the *Gurule* court believes that congress deemed competent counsel more important in prisoner civil rights cases than in criminal cases.

10. This collection of twelve factors is based substantially on *ABA Code of Professional Responsibility*, Disciplinary Rule 2–106. The

which trial judges should consider when calculating an attorney fee award. The legislative history of the attorney fee amendment to 42 U.S.C. § 1988 indicates that congress also believes that these are the "appropriate standards." S.Rep.No.94–1011, 94th Cong., 2d Sess. at 6, [1976] U.S. Cong. & Ad.News 5908, 5913. Although the Tenth Circuit once stated that the *Johnson* criteria were "inapplicable,"[11] it has also often stated that trial courts should consider most or all of the *Johnson* criteria in determining the reasonable award. See, e.g., *In re Permian Anchor Services*, 649 F.2d 763, 768 (10th Cir. 1981); *Salone v. United States*, 645 F.2d 875, 879 (10th Cir. 1981), *cert. denied*, —— U.S. ——, 102 S.Ct. 390, 70 L.Ed.2d 208 (1981); *Battle v. Anderson*, 614 F.2d 251, 258 (10th Cir. 1980); *Francia v. White*, 594 F.2d 778, 782 (10th Cir. 1979). Other Tenth Circuit cases state that the trial court should consider most or all of the *Johnson* criteria, but may or should also consider some additional relevant factor. See, e.g., *Colyar v. Third Judicial District Court*, No. 80–1809 (10th Cir. June 22, 1981) (not for routine publication),

opinion details each of the criteria, which are listed here:

1. The time and labor required.
2. The novelty and difficulty of the questions.
3. The skill requisite to perform the legal service properly.
4. The preclusion of other employment by the attorney due to acceptance of the case.
5. The customary fee.
6. Whether the fee is fixed or contingent.
7. Time limitations imposed by the client or the circumstances.
8. The amount involved and the results obtained.
9. The experience, reputation, and ability of the attorney.
10. The "undesirability" of the case.
11. The nature and length of the professional relationship with the client.
12. Awards in similar cases.

See also *Twentieth Century Fox Film Corp. v. Goldwyn*, 328 F.2d 190, 221 (9th Cir.) *cert. denied*, 379 U.S. 880, 85 S.Ct. 143, 13 L.Ed.2d 87 (1964), which lists nine criteria that trial courts should consider in determining reasonable antitrust attorney fee awards. These criteria are:

Slip Opinion at 3–4; *Fleet Investment Co. v. Rogers*, 620 F.2d 792, 793–94 (10th Cir. 1980); *Love v. Mayor of Cheyenne, Wyoming*, 620 F.2d 235 (10th Cir. 1980). The Tenth Circuit has emphasized, however, that the trial court need not consider all of the *Johnson* criteria in arriving at a reasonable award. *Littlefield v. Deland*, 641 F.2d 729, 723–33 (10th Cir. 1981).

Many trial attorneys and trial judges consider the twelve *Johnson* criteria one-by-one and then conclude that a specific award is reasonable, either without any analysis at all, or else by a simple calculation of the number of hours times hourly rate. I must confess that this approach appears to me to be much like the emperor's new clothes. Without an objective method of incorporating the relevant criteria, their consideration can only be hoped to have a talismanic effect. See, e.g., *Copeland v. Marshall*, 641 F.2d 880 (D.C.Cir.1980) (en banc):

Simply to articulate those twelve factors, however, does not itself conjure up a reasonable dollar figure in the mind of a district court judge. A formula is neces-

(1) whether plaintiff's counsel had the benefit of a prior judgment or decree in a case brought by the government,
(2) the standing of counsel at the bar—both counsel receiving the award and opposing counsel,
(3) time and labor spent,
(4) magnitude and complexity of the litigation,
(5) responsibility undertaken,
(6) the amount recovered,
(7) the knowledge the court has of the conferences, arguments presented and of work shown by the record to have been done by attorneys for plaintiff prior to trial,
(8) what it would be reasonable for counsel to charge a victorious plaintiff,
(9) what contribution shall be made by the defendant toward the fees of plaintiff's counsel.

11. In *Fleet Investment Co. v. Rogers*, 620 F.2d 792, 793 n.1 (10th Cir. 1980), the court stated, "*Johnson* was a civil rights case decided before enactment of the Civil Rights Attorney's Fees Awards Act, 42 U.S.C. § 1988, and thus is inapplicable." I cannot tell whether this is supposed to mean that *Johnson* is inapplicable to all cases, or just to non-civil-rights cases. In either case, the Tenth Circuit has not followed its own guidance on this point.

sary to translate the relevant factors into terms of dollars and cents. This is particularly true because the twelve factors overlap considerably . . .

A common, yet understandable, fault is for the trial judge to make the conclusory statement, 'After considering each of the twelve factors in *Johnson*, I find that a reasonable fee is X dollars.' This very often leads to reversal and remand.

*Id.* at 890 (citations omitted). While the Tenth Circuit has stated that the trial judge should issue "findings of fact to demonstrate how the [attorney fee award] was reached," *Love v. Mayor of Cheyenne, Wyoming*, 620 F.2d at 237, it has not specified how a trial court is to incorporate the relevant factors into an award. Until the Tenth Circuit (or Supreme Court or Congress) specifies how these criteria are to be applied there is a great danger that consideration of them will be a meaningless exercise. It also will be impossible for trial courts in this circuit to make consistent attorney fee awards.

### 2. Lodestar-Multiplier

The lodestar-multiplier approach to attorney fee calculations was first stated in *Lindy Bros. Builders, Inc. of Philadelphia v. American Radiator & Standard Sanitary Corp.*, 487 F.2d 161 (3d Cir. 1973), *later opinion*, 540 F.2d 102 (3d Cir. 1976) (en banc). The court stated that the trial court should first calculate a "lodestar" by multiplying the attorney's reasonable hourly rate by the reasonable number of hours expended on the case. 487 F.2d at 166–68. Next, this lodestar may be adjusted by a multiplier, which is to reflect the contingent nature of the litigation and the quality of the attorney's work. *Id.* at 168–69. See also 540 F.2d at 112–18. Since *Lindy* several other circuits have adopted, either explicitly or implicitly, the lodestar-multiplier approach. See, e.g., *Illinois v. Sangamo Construction Co.*, 657 F.2d 855, 862 (7th Cir.

1981); *Copeland v. Marshall*, 641 F.2d 880, 890–94 (D.C.Cir.1980); *Furtado v. Bishop*, 635 F.2d 915, 919–20 (1st Cir. 1980); *Copper Liquor, Inc. v. Adolph Coors Co.*, 624 F.2d 575 (5th Cir. 1980); *International Travel Arrangers, Inc. v. Western Airlines, Inc.*, 623 F.2d 1255, 1273–75 (8th Cir.), *cert. denied*, 449 U.S. 1063, 101 S.Ct. 787, 66 L.Ed.2d 605 (1980); *Keith v. Volpe*, 501 F.Supp. 403, 412–14 (C.D.Cal.1980) (citing *Brandenburger v. Thompson*, 494 F.2d 885, 890 n.7 (9th Cir. 1974)). The Tenth Circuit has not explicitly adopted this approach, but has implicitly approved it by adopting the *Johnson* criteria, which this approach utilizes.

Although the lodestar-multiplier approach is a useful framework for incorporating many of the *Johnson* criteria, it may sometimes lead to an improper result. The greatest danger is that it will lead to an appearance of objectivity while covering up considerable subjectivity. For example, in *Copeland v. Marshall*, the court upheld the trial judge's downward adjustment of the lodestar (before applying any multiplier) because he had found some of the hours to be "nonproductive." 641 F.2d at 902. While I agree that it is often impractical for a trial judge to review every hour of attorney time in a complex case, see *id.* at 903, I do not agree that a trial judge should simply reduce the lodestar because he believes that there was some duplication or wasted effort, see *id.* Instead, if a court is going to utilize this method, I believe that it would be better for the trial judge to make specific findings on the reasonable number of hours that are compensable.[12]

In addition, the trial judge often must exercise largely standardless discretion in determining an appropriate hourly rate. While lawyers will often readily testify on the hourly rate that they receive in private practice, it is not clear that this same hourly rate should be applied in all cases where

---

12. In a typical case attorney time can be readily split into several categories: preparation of the complaint, certification of the class (if any), discovery, trial preparation, trial, and post-trial.

Such a division assists trial judges who are reasonably familiar with civil litigation in determining whether the hours claimed for each category are reasonable.

attorney fees are awardable. In civil rights cases often neither the plaintiff nor the defendant would voluntarily hire its attorney on an hourly basis. Further, the hourly rate that an attorney charges his clients may reflect countless unbilled hours. If these hours are in fact billed when the opposing party is paying, then the hourly rate should be correspondingly lower.

There is an even greater danger that the trial judge's objectivity in calculating the lodestar will be extinguished by the multiplier. Often the two factors that are to determine the multiplier—contingency of the litigation and quality of the representation—are already incorporated into the hourly rate. See *Copeland v. Marshall*, 641 F.2d at 917–22 (dissenting opinion). In addition, appellate courts have stated very few standards for determining the appropriate multiplier. Until such standards are developed, trial courts will be forced to exercise standardless discretion in determining the multiplier. This of course defeats the main purpose of the lodestar-multiplier approach.[13]

### 3. *Multiple Attorneys*

When more than one attorney represents a prevailing party who is entitled to attorney fees, the question often arises whether their efforts were unnecessarily duplicative. See, e.g., *Stenson v. Blum*, 512 F.Supp. 680, 684 (S.D.N.Y.1981). I have not found any Tenth Circuit cases on this issue. I assume that this is normally a question of fact for the trial judge to determine, just like other questions of reasonableness in attorney fee cases.

### 4. *Percentage of Award*

In *Salone v. United States*, 645 F.2d 875 (10th Cir. 1981), *cert. denied*, —— U.S. ——, 102 S.Ct. 390, 70 L.Ed.2d 208 (1981), the trial judge awarded attorney fees equal to one third of plaintiff's judgment. The Tenth Circuit reversed. First it stated that

The Tenth Circuit has not followed any fixed standard in setting attorneys fees in Title VII cases.

*Id.* at 879. Then it remanded the case for further consideration in light of the *Johnson* criteria. Trial courts in this circuit are therefore directed to not award fees as a certain percentage of plaintiff's recovery, even if recovery is solely monetary. See also *In re Permian Anchor Services, Inc.*, 649 F.2d 763, 767–68 (10th Cir. 1981). I note, however, that there remains a problem of attorney fees exceeding a plaintiff's judgment. Often plaintiff will receive nonmonetary benefits in addition to damages (such as injunctive or declaratory relief), or there will be other benefits accruing to the public, see, e.g., *Fleet Investment Co. v. Rogers*, 620 F.2d 792, 794 (10th Cir. 1980); *Mau v. E.P.H. Corp.*, Colo., 638 P.2d 777 (1981). There are many cases, however, where the attorney fee awarded is so large in comparison to the judgment as to appear to be unreasonable. See, e.g., *Copeland v. Marshall* :

> But the fact remains that this Title VII suit involved only twenty-four class members in a very limited sector of a government agency, and concerned acts of discrimination whose sum total monetary value over a several year period was $31,-345; yet plaintiffs managed to throw such resources into the legal battle that they could claim a legal fee of $206,000 and receive from the district court a fee of $160,000. Even if the equitable relief here was (sic) worth five times the monetary award, the total amount of relief would never make a $160,000 fee appear reasonable in private litigation.

641 F.2d at 911 (dissenting opinion). I think that the value of the relief obtained should be a factor in determining reasonable attorney fees. See, e.g., *City of Detroit v. Grinnell*, 495 F.2d 448, 470 (2d Cir. 1974); *Twentieth Century Fox Film Corp. v. Goldwyn*, 328 F.2d 190, 221 (9th Cir. 1964).

---

**13.** Cf. *Keith v. Volpe*, 501 F.Supp. 403, 414 (C.D.Cal.1980) (multiplier of 3.5 is proper in a case where the lodestar was over $600,000).

Cf. *Morning Pioneer, Inc. v. Bismarck Tribune Co.*, 493 F.2d 383, 390 (8th Cir. 1974) (amount recovered is a factor that should be considered, but attorney fee award of $7,350 was proper even though plaintiff received $3 damages and not other explicit relief). However, a trial court must consider both the monetary and the non-monetary relief obtained in determining the total value of the relief. In many cases, particularly civil rights cases, the value of the injunctive or declaratory relief will greatly exceed the damage award, making proper an attorney fee award greatly in excess of the damage award.

In some cases an attorney fee award that seems unduly large when compared to all of the relief obtained will still be appropriate because of the defendant's actions. If the defendant is unreasonably obstructive or recalcitrant in discovery or settlement efforts, or if he or she unreasonably prolongs the trial, such action will justify awarding plaintiff a larger attorney fee award than would otherwise be proper. It would defeat the intent of the attorney fee statutes to limit the awards to less than the reasonable value of the attorney's services under these circumstances. See *Colyar v. Third Judicial District Court*, No. 80–1809 (10th Cir. June 22, 1981) (not for routine publication), Slip Opinion at 3 ("The basic purpose of Section 1988 is to encourage litigation to enforce civil rights by insuring the availability of competent counsel."). See also *Preston v. Thompson*, No. 78 C 3512 (N.D. Ill. June 30, 1981), Slip Opinion at 5.

### 5. *Prior Fee Agreement*

If a prevailing party has already entered into a fee agreement with his attorney I have held that the agreement should provide the basis for the attorney's statutory fee award, so long as it is fair and reasonable, and not unconscionable or parsimonious. *Pushkin v. Regents of the University of Colorado*, 504 F.Supp. 1292, 1299–1300 (D.Colo.1981), *aff'd*, 658 F.2d 1372 (10th Cir. 1981). I see no reason why an attorney should receive greater compensation from the adverse party than what he agreed was

reasonable if his own client were to pay. Of course many attorney fee cases, especially civil rights cases, are not litigated with a prior fee agreement. Often the plaintiff's attorney will only receive compensation if there is a court award so there is no relevant prior agreement. In such cases congressional intent would be frustrated unless the court independently determines a reasonable attorney fee. *Fleet Investment Co. v. Rogers*, 620 F.2d 792, 793 (10th Cir. 1980).

### C. STATUS OF LOSING PARTY AND OF PREVAILING PARTY'S ATTORNEY

Several cases have considered whether an attorney fee award should be reduced where a government party is required to pay. Because the attorney fee statutes do not make any distinction, and because the need to deter violations of civil rights is not likely to be any different, there is no obvious reason why a different method of calculation should be used. See generally *Copeland v. Marshall*, 641 F.2d at 894–96. The Tenth Circuit has rejected the argument that attorneys successfully litigating public interest issues should be compensated at a lower rate where the public will ultimately pay the award. *Battle v. Anderson*, 614 F.2d 251, 258 (10th Cir. 1980). See also *Stenson v. Blum*, 512 F.Supp. 680, 684 (S.D. N.Y.1981). There is also no bar under the Eleventh Amendment nor any common-law immunity for attorney fee awards in civil rights cases brought against state enforcement officials. *Supreme Court of Virginia v. Consumers Union of the United States*, 446 U.S. 719, 737–39, 100 S.Ct. 1967, 1977–78, 64 L.Ed.2d 641 (1980).

Another dispute is whether the fee should be reduced if the attorney for the prevailing party works for a public interest organization whose attorneys are paid lower salaries than those of entrepreneurial counsel, or if the attorney is serving his client *pro bono*. In *Colyar v. Third Judicial District Court*, No. 80–1809 (10th Cir. June 22, 1981) (not for routine publication), Slip Opinion at 2–3, the Tenth Circuit stated that fees paid to prevailing legal-aid attorneys "should be

in line with those traditionally paid regularly-employed attorneys in similar types of litigation," citing *Gurule v. Wilson*, 635 F.2d 782, 793 (10th Cir. 1980). See also *Keyes v. School District No. 1*, 439 F.Supp. 393, 406–07 (D.Colo.1977). The amount of a particular attorney's overhead should therefore not influence the reasonable value of his services. Cf. *Mau v. E.P.H. Corp.*, Colo., 638 P.2d 777, 780 (1981) ("In civil rights cases, attorneys' fees are awarded to attorneys employed by a public interest firm or organization on the same basis as to a private practitioner.... If the fee requested is reasonable in light of community standards and the other criteria to be considered by the court, it is not appropriate for a court to take into consideration what a major client may pay the attorney on an hourly basis or the possible absence of overhead expenses comparable to those borne by lawyers in private practice." (citations omitted)).

It is reasonable to award less than the otherwise reasonable value of a prevailing attorney's services when both the prevailing attorney and the losing party are funded by the same governmental entity. In *Colyar v. Third Judicial District Court* the trial court had explicitly considered this fact in determining a reasonable award. Slip Opinion at 2. Although the Tenth Circuit did not explicitly rule on the propriety of this approach, it did affirm the award as "within the area of reasonableness." *Id.* at 4. In keeping with this holding, Judge Arraj found a similar consideration to be relevant in determining a reasonable attorney fee award in *Gurule v. Wilson*, 525 F.Supp. 996, 997 (D.Colo., 1981).

## IV. QUANTUM MERUIT

The reasons are unclear, but most courts have been reluctant to look to establish case law when formulating the criteria for calculating statutorily required attorney fees. The issues, however, are not *sui generis*. There is nothing unique about them. For literally centuries courts have been awarding attorney fees on the basis of the common-fund doctrine, for vexatious or oppressive litigation, and, perhaps more relevantly, in litigation of attorney-client fee disputes.[14] As early as the second year of the reign of Edward I, (A.D. 1247), attorneys and pleaders were suing and being sued over their fees. Piers of Quarndon, in Bill 152, sought recovery of a fee of six shillings and eight pence which was promised to him by Sir Roger of Oakover in a plea of trespass. Sir Roger could not deny the claim under oath and the court ordered him to pay.[15]

Nor is the question of determining the reasonableness of attorney fees new to American jurisprudence. As early as 1886 this comment appeared in *The Mercantile Adjuster*:

> If the compensations of legal practice of the present day have one feature more prominent than any other, it is their want of uniformity. Not only is the scale of charges for a given class or quantity of professional work unequal in different localities, but in the same city—at the same bar—the amount of compensation charged and paid will be as widely diverse as are the tastes and caliber of counsel. One lawyer makes it a rule never to appear in court for less than $10.00, and never to try a case for less than $25.00; another, his equal in ability, though not in pride, will graduate his charges according to time consumed, and will do professional work for ministerial or clerical wages, his minimum being perhaps $1.00 and $5.00, to the other's $10.00 and $25.00. But it is not the minimum alone that best illustrates the arbitrary

---

14. *See* generally Anno., Measure or basis of attorney's recovery on express contract fixing noncontingent fees, where he is discharged without cause or fault on his part, 54 A.L.R.2d 604, § 5 (1957). The most recent case on the subject is *Rosenberg v. Levin*, 409 So.2d 1015 (Fla.1982).

15. The Publication of the Selden Society, Vol. 30, Select Bills in Eyre, the 1292–1333, Wm. Cradolock Bollard, ed. (1914). *See also* The Origin of the Legal Profession in England, 11 Irish Jurist 126.

and uneven scale of lawyer's fees in this country. It is in the "high and solar walks" of the profession that these irregularities luxuriate. The minimum is regulated by a comparatively simple rule, the elements of service considered being, principally, time employed, amount involved, and the ratio of supply and demand, or the degree of competition. But when questions of great political or financial importance arise, when a corporation is to be wrecked, a monopoly to be fortified, a gigantic fraud to be throttled, or a principle underlying the whole system of the nation's finances to be made externally secure, other elements are taken into account. Then experience, courage, diplomacy, social prestige, character, and the amount of the responsibility borne, and not learning merely, are carefully weighed, and all of these enter largely into the estimate of the value of the services of the advocate. Here, competition, too, is largely eliminated.[16]

█ At this juncture in our jurisprudence the policy question of when to award attorney fees has been definitively addressed by congress.[17] Currently, in civil rights cases, absent extraordinary circumstances, attorney fees are to be awarded to prevailing plaintiffs. The fact that attorney fees, because of statutes, are to be paid by the opposing party should not have any bearing on the judicial determination of reasonableness. Lawyers, like doctors, do not obtain the right to payment for services rendered on the basis of the volume of the work performed or the results obtained. While it is permissible for members of such professions to enter into contracts that make payment contingent on the volume of work done or the results obtained, the value of the work is still determined by the traditional criteria employed in quantum meruit cases.[18]

In quantum meruit cases courts look to the previous dealings the parties have had, the customary value for similar services rendered in the same community, the skill required to undertake the work performed, the relative degree of sophistication of the parties, the degree of efficiency demonstrated by the attorney, and, within this context, the actual amount of work performed.

In determining the actual amount of work performed there is an abiding danger of rewarding incompetence. One should not have to pay for the building of a clock in order to find out the time of day. In theory, if not in practice, the rate charged and the time required to perform the task should be correlative. Thus, an experienced attorney should charge at a higher rate than a tyro because the master should take less time than the novice. Ideally speaking, the consumer should have to pay no more for the services of one than the other. Further, courts should not be mere meter readers,[19] but rather determine whether the number of dollars on the meter actually reflects the reasonable value of the attorney's services. The foregoing factors should not be viewed as disjointed consider-

16. 36 Commercial Law Journal 207 (1931).

17. I take note of bills pending and budget submissions being made to limit the hourly rate of attorney fees to be awarded against the government to $25.00.

18. See, e.g., United States v. 243.538 Acres of Land, 509 F.Supp. 981, 988 (D.Hawaii 1981) ("Since the statute requires that the awards be reasonable and the basis for most of the contractual arrangements is compensation on a quantum meruit basis, the appropriate upper limit would be the market value of an attorney's services rather than actual charges." (emphasis in original, citation omitted)); In re THC Financial Corp. Litigation, 86 F.R.D. 721,

738 (D.Hawaii 1980) ("The purpose of an award under the equitable fund doctrine is to compensate the attorney for the reasonable value of his services benefiting the unrepresented claimants."); Cf. Gurule v. Wilson, 635 F.2d 782, 793 (10th Cir. 1980) (reasonable award should "fully compensate an attorney for his time"). Cf. People v. Radinsky, 182 Colo. 259, 512 P.2d 627 (1973) (Where the client terminates the relationship, the attorney is only entitled to the reasonable value of his services according to the standards of quantum meruit and not for the agreed upon sum.)

19. See Gurule v. Wilson, 525 F.Supp. 996, 997 (D.Colo.1981).

ations, but as different elements that can be examined in order to determine the reasonable value of the services rendered. Further, the determination of reasonableness should give consideration to the law of the forum.

In Colorado various quantum meruit standards have been expressed. The leading case is *Bryant v. Hand*, 158 Colo. 56, 404 P.2d 521 (1965), in which the Colorado Supreme Court said the test is a consideration of the amount of time spent, the novelty of the questions presented and the risks of loss to the client and the attorney. In *Hartman v. Freedman*, 197 Colo. 275, 281, 591 P.2d 1318, 1322 (1979), Mr. Justice Rovira expressed the following test:

> The determination of reasonableness is a question of fact for the trial court and will not be disturbed on review unless it is patently erroneous and unsupported by the evidence. *Pierce v. Nier*, 138 Colo. 402, 334 P.2d 440 (1959). In awarding attorney's fees, the trial court may consider, among other factors, the amount in controversy, the length of time required to represent the client *effectively*, the complexity of the case, the value of the legal services to the client and the *usage* in the legal community concerning fees in similar cases.... However, no one of these factors is conclusive. Accordingly, the defendant's contention that the award of attorney's fees is limited by the amount of judgment on the merits is rejected. (emphasis added).

Often it is difficult to compare the reasonable value of attorneys' services in different cases. This is particularly so in complex suits involving protracted trials, hearings and appeals. The Tenth Circuit has frequently observed "that the court of appeals cannot fix an attorney's fee with any degree of accuracy and that such determi-

nation should be made by the trial court based on evidence meeting most of the criteria set forth in *Johnson v. Georgia Highway Express Inc.*" [20] and, "It is, of course, impossible for this court on review to fix an attorney's fee with any degree of accuracy." [21] Trial courts are likewise burdened by the lack of uniformity in charging fees either in the local community or in other jurisdictions. Evidence presented almost always consists of time sheets and testimony by the attorneys who seek the award buttressed by outside attorneys who testify as experts.

Rarely is a trial judge presented with testimony by consumers of legal services or by evidence of awards in other cases. It is often necessary to value different segments of a lawsuit separately. By such parsing, it is easier to compare segments of past lawsuits with those of the one under consideration. The calculation of a reasonable fee for the separate segments of preparation of the complaint, certification of the class (if there is one), discovery, trial preparation, trial work, post-trial and appellate work will render relevant evidence from different types of cases.[22] Attorney fees for discovery in a complex antitrust case, for example, will be relevant in determining attorney fees for discovery in a complex prisoner rights case. Attorney fees for trial in many types of civil litigation will be relevant in determining the reasonable attorney fees for trial of a civil rights case. (Hopefully, the critical comments contained in the 1886 issue of *The Mercantile Adjuster, supra*, will no longer be as poignant as they are presently.) Given such evidence, trial courts could then make valuations on fees that clients actually paid in cases where there was a contractual fee agreement. In this way, court-ordered fee awards will more accurately reflect the true market value of the attorney's services.[23]

---

**20.** Barrett, J. *Battle v. Anderson*, 614 F.2d 251, 258 (1980).

**21.** Doyle, J., *Francia v. White*, 594 F.2d 778, 782 (1979).

**22.** If it is a prevailing defendant seeking the attorney fees, then these segments will have to be modified.

**23.** I have discussed the law as I find it and the law as I think it should be in order to present my findings with regard to the case at bar in the clearest light. I am keenly aware of the differences between that which I think is and that which I think ought to be. It is my wish that in addition to deciding the issues concerning an award of attorney fees and costs in the

## V. ATTORNEY FEES IN THIS CASE

There is no question that the plaintiffs were the prevailing party. After over four years of litigation the plaintiffs have vindicated most of the rights that they asserted. See generally *Ramos v. Lamm*, 520 F.Supp. 1059 (D.Colo.1981). Although they were unsuccessful on a few minor aspects of their claims for relief, I conclude that all of their attorneys' work was reasonably calculated to promote their interests and that there were no substantial separate issues that the plaintiffs asserted but on which they did not prevail. For the reasons set out in part II, *supra*, I therefore conclude that the plaintiffs' attorneys are entitled to compensation for their work on all of the issues that they asserted and defended in this case.

■ Plaintiff Ramos filed his initial *pro se* complaint on November 30, 1977. I denied defendant's motion to dismiss on February 8, 1978. Plaintiffs' attorneys entered their appearances on February 15, 1978. They include in their attorney fee request some time for work done before February 15, 1978. I conclude that this work is also properly assessed against the defendants because it was directly connected with the work done after these attorneys entered their appearances.[24]

Although the quantum meruit approach that I advocated in part IV, *supra*, does not always necessitate an hourly-rate approach, I conclude that I must engage in such a calculation in this case. First, none of the parties have submitted any evidence on the reasonable value of the plaintiffs' attorneys' services, other than that based on an hourly-rate approach. Second, no one submitted any evidence on the value of attorneys' services in similar cases.[25] Finally, because of the tremendous amount of services rendered by the plaintiffs' attorneys in this case, and because of the failure of any party to attempt to divide up the litigation into parts when evaluating the value of the services, an hourly-rate calculation is the only feasible approach left to me.

■ Several different attorneys represented the plaintiffs in this case. Often during the pre-trial work and at the hearings and trial more than one attorney for the plaintiffs was present. I conclude that it is reasonable for the plaintiffs to claim compensation for the work of all attorneys, even if more than one was present. This case was exceedingly complicated because, there were unresolved legal issues, because the plaintiff's class included several hundred members, and because there were vol-

case before me, this opinion will serve as a stimulus for higher courts to lead the trial courts through this unchartered and unsettled area of the law. It should be obvious that I favor a market data approach which gives the trial judge some hard facts which have been tested in the crucible of experience in the marketplace. I have been able to persuade lawyers to present this type of evidence in only a very few cases.

24. Defendants contend that it is inappropriate for me to award any attorney fees for work done after April 20, 1979, when they submitted an offer of judgment to the plaintiffs. I reject this argument because the offer of judgment has not been filed. I also note that defendants' argument would be valid only if "the judgment finally obtained by the [plaintiffs was] not more favorable than the offer." F.R.Civ.P. 68.

25. In a prisoner civil rights case there will rarely be any evidence on attorney fees that plaintiffs have paid in similar cases. I note in pass-

ing that this is not true in other civil rights cases such as those involving employment discrimination.

At one of the attorney fee hearings in this case both sides offered testimony of lawyers of their opinions of the reasonable attorney fee that should be awarded in this case. Each of the experts offered his opinion on the various *Johnson* criteria. Each focused, however, on the number of hours claimed. Quite naturally, the defendants' experts thought that the hours claimed were excessive while the plaintiffs' expert thought that they were understated. All of the experts are distinguished members of the bar and all were equally credible. This testimony as a whole therefore was not particularly helpful to me. Frankly, I think this practice of calling attorneys as experts should be discouraged. This case provides a dramatic example: Those attorneys would be on anyone's list of the outstanding members of the Colorado bar and they are half a million dollars apart in their appraisals!

umes of evidence presented by both sides.[26] It therefore was appropriate for the plaintiffs to have both attorneys experienced in prison litigation and attorneys experienced in complex civil litigation.[27]

■ The defendants have argued that the attorney fee award in this case should be lower because the defendants were government officials and because this case involved public interest issues. As I noted in part III.C., *supra*, the appellate courts have rejected this argument. The defendants also have argued that any attorney fee award is barred by the Eleventh Amendment. The U.S. Supreme Court has rejected this argument. *Maher v. Gagne*, 448 U.S. 122, 130–33, 100 S.Ct. 2570, 2575–77, 65 L.Ed.2d 653 (1980); *Hutto v. Finney*, 437 U.S. 678, 695, 98 S.Ct. 2565, 2576, 57 L.Ed.2d 522 (1978).

The defendants also assert that I should consider that all of the plaintiff's attorneys appeared in this case *pro bono* and that many of them work for public-interest organizations. The defendants likewise suggest that the hourly rate charged by the Attorney General of Colorado is an indication of a reasonable rate in this case. For the reasons set out in part III.C., *supra*, I reject these arguments and conclude that the plaintiffs' attorneys are entitled to an award in this case equal to that paid to regularly-employed attorneys involved in this type of litigation.[28]

In three different applications, which I have personally scrutinized, the plaintiffs' attorneys have submitted numerous affidavits and time sheets listing all of the hours that they claim. They total as follows:

| ACLU Foundation of Colorado (Holland & Hart) | |
|---|---|
| James Hartley | 2265.9 |
| Hugh Gottschalk | 215.1 |
| Other Holland & Hart attorneys [29] | 253.6 |
| Luke Danielson | 20.0 |
| **National Prison Project** | |
| Peggy Ann Wiesenberg | 3579.55 |
| Ralph I. Knowles, Jr. | 993.25 |
| Steven Ney | 95.7 |
| Alvin J. Bronstein | 48.0 |
| Shawn Moore | 64.5 |
| **Colorado Coalition of Legal Services** | |
| Dudley Spiller | 609.15 |
| **ACLU Foundation of Colorado (Kelly/Haglund/Garnsey & Kahn)** [30] | |
| Edwin S. Kahn | 140.3 |
| Barbara Salomon | 2.9 |

■ The defendants objected to these hours listings on several grounds. Their strongest objection is that not all of the hours claimed were recorded in contemporaneous time records. While this certainly is the preferred approach, it is not required. *Battle v. Anderson*, 614 F.2d 251, 256 (10th Cir. 1980); *Keyes v. School District No. 1*, 439 F.Supp. 393, 411 (D.Colo.1977). I conclude that the hours claimed here are reliable and are, if anything, an understatement of the actual time expended by the plaintiffs' attorneys. The defendants also point out that, for several dates, different attorneys claim different amounts of time for the same activity. There is no indication, however, that any of the attorneys overstated their hours. I therefore conclude that these inconsistencies represent an underbilling of hours and therefore may be ignored here.

■ The plaintiffs also claim 227.5 hours for law clerks' time and 688.4 hours

---

**26.** The documentary evidence alone, packed tightly, extends more than fourteen linear feet. The defendants' plan to achieve compliance contains unnumbered pages, but it is half a foot thick.

**27.** Throughout the trial and hearings the defendants also had numerous attorneys at counsel table.

**28.** The plaintiffs' attorneys and the defendants are not funded by the same entity. The consid-

erations of *Colyar v. Third Judicial District Court*, noted in part III.C., *supra* therefore are not relevant here.

**29.** The other Holland & Hart attorneys are not listed by name in this application. Their initials are listed in the time records that were submitted. The amounts were verified in Mr. Hartley's affidavit.

**30.** Kelly/Haglund/Garnsey & Kahn worked solely on the attorney fee application.

for legal assistants' time. While there is some dispute on whether this time should be included in an attorney fee award, I conclude that it is proper if the firm that employs these people has a normal practice of billing their hours separately and if the attorneys' hourly rates do not reflect this as overhead. The importance of the billing being a normal practice is that I can find no more credible information that the charge is accepted in the marketplace. These hours are properly billable here.

■■ There are many hours in the listings for time spent traveling. Where the listing indicates that work on this case was done during the travel time, the hours are properly included. However, where there is no indication that work on this case was done during the travel, the hours should not be included. I therefore must reject the following claimed hours.

| | |
|---|---|
| Peggy Ann Wiesenberg: | 87.5 |
| Ralph I. Knowles, Jr. | 21.0 |

There also are many hours claimed for time spent working on this attorney fee application. The Tenth Circuit has stated that attorney fees are proper for work done resolving the fee issue itself. *Love v. Mayor of Cheyenne, Wyoming*, 620 F.2d 235, 237 (10th Cir. 1980). I conclude that this should only be done for the attorney pursuing the application, not for all of the attorneys who are only acting as clients. In this case only Mr. Kahn and Ms. Salomon may properly bill for time on the attorney fee application. I therefore reject the following hours:

| | |
|---|---|
| James Hartley: | 15.0 |
| Peggy Ann Wiesenberg | 196.4 |
| Ralph I. Knowles, Jr. | 31.85 |
| Alvin J. Bronstein | 18.25 |

There are other hours for miscellaneous matters that I must reject. I deduct 3.7 hours from Hugh Gottschalk's time for that claimed for attending, but not participating in, the Tenth Circuit argument in this case. I also deduct 47.0 hours that Peggy Ann Wiesenberg claims for time spent regarding

speeches and meetings, and for twice-stated time on July 16, 1979. I deduct 0.5 hours from Dudley Spiller's time for the time spent arguing the Howell consolidation before Judge Matsch. That time must be claimed from Judge Matsch.

The defendants also object to the time claimed by various attorneys for their work done on the relationship of this case with *Marioneaux v. Colorado State Penitentiary*, Civil Action No. 78–K–1065, a related case that was before me involving the Colorado prisons. There was some overlap between the two cases because they involved many of the same parties and similar issues. I conclude that the hours claimed were reasonable and necessary for the efficient prosecution of this case and to avoid costly duplication of effort for the plaintiffs, the defendants, and the courts.

The defendants object to the number of hours claimed by the plaintiffs' attorneys for drafting their petition for writ of certiorari and opposing the defendants' writ of certiorari in the U.S. Supreme Court. Defendants' basic contention is that the number of hours claimed are excessive when compared to the length of the petitions. I reject this argument. Supreme Court rules 21.4 and 22.2 provide that the petition for writ of certiorari and the opposition brief shall be "as short as possible." I am not bold enough to penalize attorneys who spend extra time to comply with U.S. Supreme Court rules. Often a short and concise writing will take more time than a long and rambling one. See generally *United States v. Price*, 448 F.Supp. 503, 503 (D.Colo.1978) ("This opinion is too long. I apologize for its length but I simply didn't have time to write a shorter one."). See also Thomas Jefferson, *quoted in* J. Bartlett, *Familiar Quotations* 473b (1968):

Amplification is the vice of modern oratory. It is an insult to an assembly of reasonable men, disgusting and revolting instead of persuading. Speeches measured by the hour, die by the hour.

See also W. Strunk, Jr. & E. White, *Elements of Style* 17 (1972):

Vigorous writing is concise. A sentence should contain no unnecessary words, a paragraph no unnecessary sentences, for the same reason that a drawing should have no unnecessary lines and a machine no unnecessary parts. This requires not that the writer make all his sentences only in outline, but that every word tell.

In many briefs, much oral argument and most cross examination in my court these admonitions are not followed. In addition to raising the ire of an irascible trial judge, such lack of brevity also results in less effective advocacy. I therefore can only commend attorneys who spend extra time to make their writings more concise and therefore more effective.

Making the deductions enumerated above, I conclude that the following hours are reasonable:

| | |
|---|---|
| James Hartley | 2250.9 |
| Hugh Gottschalk | 211.4 |
| Other Holland & Hart attorneys | 253.6 |
| Luke Danielson | 20.0 |
| Peggy Ann Wiesenberg | 3248.65 |
| Ralph I. Knowles, Jr. | 940.4 |
| Steven Ney | 95.7 |
| Alvin J. Bronstein | 29.75 |
| Shawn Moore | 64.5 |
| Dudley Spiller | 608.65 |
| Edwin S. Kahn | 140.3 |
| Barbara Salomon | 2.9 |
| Holland & Hart law clerks | 227.5 |
| Holland & Hart legal assistants | 688.4 |

Next I must determine what hourly rates are appropriate.

I can find no Tenth Circuit case which answers the question whether the applicable hourly rate is the one which an attorney uses when the work was done or is the rate which is current at the time the attorney makes an application for an award. Other courts have taken three different approaches to this issue and I have discussed the problem in *Black Gold Ltd. v. Rockwool Industries, Inc.,* 529 F.Supp. 272, 276 (D.Colo.1981). As stated there the three different approaches are:

a. use the attorney's current hourly rate;

b. use the hourly rate in effect when the services were performed; and

c. use the hourly rate in effect when the services were performed, but then adjust it for inflation and delay.

Most decisions directly on point follow the first approach.

In *In re THC Financial Corp. Litigation,* 86 F.R.D. 721, 740 (D.Hawaii 1980), the court noted the division of authority:

There is a division among the courts as to whether the hourly rate to be applied is the current rate or the rate that was charged during the earlier period when the services were actually rendered. It has been held that current hourly rates should be used in the lodestar calculation to minimize the detrimental effect of inflation upon the fee award. *In re Ampicillian Antitrust Litigation,* 81 F.R.D. 395 (D.D.C.1978); *In re Master Key Antitrust Litigation,* 76 F.R.D. 460 (D.Conn.1977), *aff'd,* 580 F.2d 1045 (2d Cir. 1978); *City of New York v. Darling-Delaware,* 440 F.Supp. 1132 (S.D.N.Y.1977). Other courts have held expressly that the hourly rate to be applied is not the current rate but the rate in force when the work was done. *Desimone v. Industrial Bio-Test Laboratories, Inc.,* 83 F.R.D. 615 (S.D.N.Y.1979); *Weiss v. Drew Nat'l Corp.,* 465 F.Supp. 548, 552 (S.D. N.Y.1979); *Kane v. Martin Paint Stores,* 439 F.Supp. 1054, 1055 (S.D.N. Y.1977), *aff'd* 578 F.2d 1368 (2d Cir. 1978).

The court went on to note that the evidence before it did not sharply differentiate between the two rates, but seemed to be based on current rates, an approach that the court apparently followed. *Id.* at 742.

In *Black Gold* I used the lodestar approach and incorporated delay and inflation factors into the contingency factor of the multiplier. I did this reluctantly because I felt required by the circumstances of that case to take that approach. In the instant case I do not intend to use a multiplier. Hence I will consider such questions as risk, overhead, delay and inflation in arriving at an appropriate hourly rate for each of the attorneys who participated in the representation of the plaintiffs. Plaintiff's expert attorney testified that prevailing market rates in Colorado for attorneys of comparable ability to those who represented the plaintiffs here range from $45 to $200 per hour. All of the awards here are well within that range.

## DESCRIPTIONS OF THE ATTORNEYS IN THE CASE

### JAMES E. HARTLEY

Mr. Hartley is a partner in the law firm of Holland & Hart with principal offices in Denver, Colorado. He has acted throughout this litigation as a cooperating attorney with the American Civil Liberties Union Foundation of Colorado, Inc. One of the purposes of the foundation is to supply legal counsel to "persons involved in activities wherein their civil rights and liberties, as guaranteed to them under the laws of the United States, are threatened or infringed upon, and who may be unable to obtain such counsel without assistance." [Articles of Incorporation, Article 3.] The foundation does not employ full-time staff attorneys. Rather, it refers cases to "cooperating attorneys" who are responsible for representing the individual clients. A cooperating attorney donates to the foundation the time he or she spends representing the client with the understanding that any fees or other sums recovered are to be paid to the foundation.

Mr. Hartley has been a member of the Bar of the State of Colorado since October, 1974. He is admitted to practice before the United States District Court for the District of Colorado and the United States Court of Appeals for the Tenth Circuit. He graduated from the University of California School of Law (Boalt Hall) in June, 1974. He is a member of the Order of the Coif and was an editor of the *California Law Review*. He was employed as an associate with Holland & Hart and since his employment has specialized in complex litigation with emphasis on anti-trust law. He has had extensive experience in multi-party class action litigation. He is a member of the American, Colorado, and Denver Bar Associations and the Litigation, Anti-Trust and Individual Rights and Responsibilities Sections of the American Bar Association.

His specific responsibilities in this case included primary contact with members of the plaintiff class. He corresponded and to this day continues to correspond with prison inmates and he supervised or personally conducted hundreds of prisoner interviews. Prisoner correspondence in this case from the court's own examination amounts to thousands of pages of frequently handwritten and sometimes illegible letters to the court and to counsel. Mr. Hartley prepared or supervised the preparation of many of the pleadings and other papers filed with the court. He supervised the lawyers working with him at Holland & Hart and drafted a major share of the numerous interrogatories, answers to interrogatories, requests for production of documents, motions, and legal memoranda. He attended all pre-trial hearings, status conferences and attended and participated fully in the trial of the case. He has been the principal contact for the court in communicating with the plaintiffs and the numerous counsel appearing herein. He has participated in all post-trial proceedings and perhaps, most importantly, has been the person responsible for handling emergency matters which have frequently been concerned, without exaggeration, with the life and death of individual inmates.

Mr. Hartley is possessed of considerable skill as an attorney. His superb preparation and enviably succinct direct and cross-

examination of witnesses was of considerable benefit to the court in coming to grips with the numerous and complex problems presented by the facts of the case.

There is no doubt that Mr. Hartley was taken away from his normal commercial litigation practice nor is there any question that his participation in this case prevented him from accepting other work. Taking these factors into consideration along with his demonstrated skill and performance and considering testimony regarding the reasonableness of rates charged in this district I determine that his appropriate hourly rate should be $95 per hour.

## HUGH Q. GOTTSCHALK

### AND OTHER HOLLAND & HART ATTORNEYS AND LEGAL ASSISTANTS

As previously mentioned in this section the defendants objected to the hours listed by some of the attorneys because they were not accompanied by contemporaneous time records. Such is certainly not the case with those attorneys working for Mr. Hartley at the Holland & Hart firm. The records of that firm are detailed, complete and exact. For the most part the hours represent the work performed by Mr. Gottschalk and other younger attorneys under Mr. Hartley's direction. These hours represent work performed which did not require the skills of more experienced attorneys and yet constituted necessary and efficient effort. The average billing rate for the 465 hours which I have deemed reasonable amounts to $44.82. This average billing rate does not make any adjustments for inflation, delay or the contingent nature of the litigation. Taking these factors into consideration and recognizing an approximate contemporary rate of $60 per hour I conclude that this latter figure is the appropriate hourly rate.

## LUKE DANIELSON

Mr. Danielson rendered legal services while an associate at the firm of Holland & Hart and these hours and rates are included in the above paragraph. After leaving the employ of Holland & Hart Mr. Danielson performed 20 additional hours of legal services. Mr. Danielson was admitted to the bar of this court in 1975. He has been actively engaged in the practice of law with a concentration in civil litigation and heavy emphasis on discovery matters. Most of the work he performed in this case related to his area of expertise and I determine that an appropriate billing rate for him given the contingency factors considered above is $70 per hour.

## PEGGY ANN WIESENBERG

During the course of this litigation Miss Wiesenberg was a staff attorney at the National Prison Project. She was designated by that Project as lead counsel for the plaintiffs in this case. She has been a member of the bar since 1975. She has been admitted to practice in various United States District Courts and she has appeared pro hac vice in federal courts in Maryland, Oklahoma, and Colorado. Miss Wiesenberg graduated from Northeastern University School of Law in 1975 and since that time has specialized in civil rights and constitutional litigation in federal courts. She has worked for the Center for Constitutional Rights, the United States Attorney for the Southern District of New York, the National Prison Project of the American Civil Liberties Union, The Legal Aid Society of Minneapolis and is currently employed in Boston, Massachusetts in similar endeavors. While working at the Legal Aid Society of Minneapolis, Miss Wiesenberg was awarded a Reginald Heber Smith Community Lawyer Fellowship. She has testified as an expert witness on prisoner rights issues before various sub-committees of the Judiciary Committee of the United States House of Representatives. She has testified as an expert on prisoner rights issues before the United States Department of Health, Education and Welfare, the Federal Bureau of Prisons, the United States Parole Commission, and various state legislative and administrative bodies. She has taught numerous workshops and seminars on prisoners

rights to lawyers and correctional officials throughout the United States and is a member of the faculty of the Practicing Law Institute. Miss Wiesenberg serves as a consultant to the National Institute of Corrections of the Department of Corrections of the U.S. Department of Justice and has conducted training sessions for correction officials on prisoner rights. She has lectured before various professional organizations throughout the United States and regularly works as a consultant with lawyers throughout the United States on prisoner rights cases and litigation strategy.

Throughout the course of litigation Miss Wiesenberg demonstrated a profoundly insightful and immediate grasp of all of the numerous legal issues involved in prisoners rights litigation. She is a convincing and dedicated advocate. Without doubt Miss Wiesenberg set the pace for other counsel in this case. I am convinced that her preparation saved the court and counsel literally hundreds of hours which otherwise would have had to have been expended in basic research with respect to both the law and the facts in the case. Given the excellence of Miss Wiesenberg's performance and considering the delays from the time of the work performed to the award of a fee, I determine that her reasonable hourly rate for service performed in this case should be $85 per hour.

## RALPH I. KNOWLES, JR.

Ralph I. Knowles, Jr. was admitted to practice in the State of Alabama in September, 1969. He was in full-time private practice in Tuscaloosa, Alabama from 1970 until March, 1978. During that period of time he was involved in the most significant prisoner litigation to have occurred in this country. To name but a few, Mr. Knowles appeared as counsel in *Pugh v. Locke,* 406 F.Supp. 318 (M.D.Ala.1976), *aff'd and remanded sub nom., Newman v. Alabama,* 559 F.2d 283 (5th Cir. 1977); *cert. denied in relevant part in sub nom. Alabama v. Pugh,* 438 U.S. 781, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978). *Lynch v. Baxley,* 386 F.Supp. 378

(M.D.Ala.1974) (three-judge court). Finally, *Wyatt v. Aderholdt,* 503 F.2d 1305 (5th Cir. 1974), *sub nom. Wyatt v. Stickney,* 325 F.Supp. 781 (M.D.Ala.1971), 344 F.Supp. 373 (M.D.Ala.1972).

In March, 1978 Mr. Knowles became the Associate Director of the National Prison Project of the American Civil Liberties Union Foundation, Inc. His duties in that position included the preparation and trial of cases in which he was the primary lawyer and also general supervision of litigation being handled primarily by other staff lawyers. Between March, 1978 and October, 1978 Mr. Knowles was involved in general consultation concerning the *Ramos* case and in the late fall of 1978 became co-counsel. He participated throughout the trial and post-trial proceedings in this case. A general conclusion regarding his excellent ability and integrity is not sufficient. I must point out that during the entire time I have been connected with the profession of law as student, practitioner and judge I have never observed a lawyer who was more talented or accomplished in the art of cross-examination. Mr. Knowles undertook the cross-examination of most of the defendant's expert witnesses with devastating effect. Given his experience and consummate ability as a trial advocate and considering the delay in awarding attorneys fees from the time the services were performed to the present date, the effect of inflation and the amount requested by Mr. Knowles, I determine that a reasonable and appropriate hourly rate for his services is $95 per hour.

## STEVEN NEY

### and

## SHAWN MOORE

Mr. Ney was an attorney working with the National Prison Project during the early stages of this litigation and Mr. Moore is an attorney presently employed by that project who worked during the later stages of this litigation. Both were assistant attorneys who provided services of a similar

nature and quality to that of Mr. Gottschalk. Accordingly, I find the appropriate hourly rate for the services rendered by these two attorneys to be the same as that for Mr. Gottschalk and other Holland & Hart attorneys. *viz.*, $60 per hour.

## ALVIN J. BRONSTEIN

Mr. Bronstein is the Director of the National Prison Project and as such supervised all of the attorneys working on the case for that organization. He is an internationally recognized expert in the field and contributed to the success of this case in much the same manner as the senior partner of any large law firm. As such and considering the contingent nature of this case together with the effects of inflation and delay I determine that the appropriate hourly rate for Mr. Bronstein's time expended in this case is $125 per hour.

## DUDLEY SPILLER

Dudley Spiller was one of the attorneys who appeared in this action. He has been a member of the Bar of the State of Louisiana since 1969 and of the State of Colorado since May, 1977. He is admitted to practice before the United States District Court for the District of Colorado. During part of his career he was an attorney working for the Colorado Coalition for Legal Services. He has tried cases as lead counsel in both state and federal courts in Louisiana, Colorado, Missouri, Kentucky, and Arkansas. He was a staff attorney with the National Juvenile Law Center in St. Louis, Missouri from 1972 to 1974 and served as Assistant Director of the Resource Center on Correctional Law and Legal Services of the American Bar Association Commission on Correctional Facilities and Services from 1975 to 1976. Much of his work in the present case involved the planning of the litigation, conferences with all the lawyers, interviews with prisoners and a considerable amount of work on the issues relating to class certification. Mr. Spiller spent considerable time in trial preparation, in the preparation of witnesses for their testimony and in confer-

ences regarding trial strategy. He participated in the first trial, but then, due to circumstances beyond his control, withdrew from the case on November 7, 1979, the last day of the first trial. Taking into consideration his abilities and background, the current rates being charged by attorneys in this community possessed of similar skill, the effects of inflation and delay on the award of an attorneys fee, and the fact that he withdrew immediately after the first trial, I determine his reasonable billing rate to be $70 per hour.

## EDWIN S. KAHN

### and

## BARBARA SALOMON

Edwin S. Kahn graduated from the Harvard Law School in June, 1965. From that time until December, 1977 he was an associate and then a partner in the firm of the Holland & Hart. In January, 1980 he became a partner in the firm of Kelly/Haglund/Garnsey & Kahn. Throughout his professional practice he has specialized in federal court litigation. He is a member of the Bar of the State of Colorado and admitted to practice before the United States District Court for the District of Colorado and the Court of Appeals for the Tenth Circuit. Mr. Kahn is a recognized expert in matters concerning attorney fees. He has testified as such in the *King Resources* securities litigation and the *Woodmoor* securities litigation. He is frequently called upon by lawyers to represent them in attorney fee litigation. Mr. Kahn enjoys the reputation of being one of the most able and admired trial lawyers in the bar of this court. As of October, 1980 his then current hourly billing rate was $105 per hour. Taking into consideration the complexity of this case, the lack of any contingency involved in his representation of the attorneys seeking attorney fees and his recognized skill and experience I determine that the appropriate billing rate for services performed in this case is $110 per hour. During the course of his representation Mr. Kahn found it necessary to call upon his associate,

Barbara Salomon, who is an attorney of comparable experience and skill to that of Mr. Gottschalk and for the reasons stated in relation to the fixing of his appropriate hourly rate I determine hers to be the same, *viz.*, $60 per hour.

## LAW CLERKS AND LEGAL ASSISTANTS

As mentioned in part V. *supra* there is considerable confusion at the trial court level about whether law clerks' and legal assistants' time should be included in an attorney fee award. I believe the trial judge should examine claims of this nature to determine whether the legal assistants' and law clerks' time enhanced the value of the lawyers' services. If the work is duplicative or merely educational for the law clerks then the time should not be charged as part of the attorney fee award. If, however, law clerks and legal assistants have performed work under the supervision of a lawyer which enabled the lawyer to expend less of his more expensive time on a given case then the law clerk and legal assistant time should be awarded on the basis that it enhances the attorney's services and efficiency in producing legal services at a reduced cost to the consumer. Here the firm of Holland & Hart has employed law clerks and legal assistants and normally bills their hours separately. Thus the attorneys' hourly rates do not reflect the services of law clerks and legal assistants as overhead. Considering the delay in awarding this fee from the time the services were performed and money expended by the firm together with inflation and testimony regarding the reasonable rates for services of law clerks and legal assistants I determine those rates in the instant case to be $35 per hour for legal assistants and $25 per hour for law clerks.

██ In summary, I make the following awards:

| Attorney | Hours | Hourly Rate | Amount |
| --- | --- | --- | --- |
| James Hartley | 2250.9 | $95 | $213,835.50 |
| Hugh Gottschalk | 211.4 | 60 | 12,684.00 |
| Other H & H attorneys | 253.6 | 60 | 15,216.00 |

| Attorney | Hours | Hourly Rate | Amount |
| --- | --- | --- | --- |
| Luke Danielson | 20.0 | 70 | $1,400.00 |
| Peggy Ann Wiesenberg | 3248.65 | 85 | 276,135.25 |
| Ralph I. Knowles, Jr. | 940.4 | 95 | 89,338.00 |
| Steven Ney | 95.7 | 60 | 5,742.00 |
| Alvin J. Bronstein | 29.75 | 125 | 3,718.75 |
| Shawn Moore | 64.5 | 60 | 3,870.00 |
| Dudley Spiller | 608.65 | 70 | 42,605.50 |
| Edwin S. Kahn | 140.3 | 110 | 15,433.00 |
| Barbara Salomon | 2.9 | 60 | 174.00 |
| H & H law clerks | 227.5 | 25 | 5,687.50 |
| H & H legal assistants | 688.4 | 35 | 24,094.00 |
| | | Total | $709,933.50 |

## VI. COSTS

In addition to requesting attorney fees, the plaintiffs' attorneys also request reimbursement of $106,721.59 for expenses that they incurred pursuing this lawsuit. These expenses include deposition costs, expert witness fees and expenses, photocopying, postal, telephone, book and secretarial costs, travel expenses, and paralegal fees. In support of this claim, they cite three cases: *Selzer v. Berkowitz*, 477 F.Supp. 686, 691 (E.D.N.Y.1979); *Population Services International v. Carey*, 476 F.Supp. 4, 8 (S.D.N.Y. 1979); *Palmigiano v. Garrahy*, 466 F.Supp. 732, 744 (D.R.I.1979), *aff'd* 616 F.2d 598 (1st Cir.), *cert. denied*, 449 U.S. 839, 101 S.Ct. 115, 66 L.Ed.2d 45 (1980). Of these cases, only *Population Services* cites any authority in support of its award of costs. Because the award of costs is rarely discussed in detail, I will first summarize the applicable law, and then consider the proper award in this case.

### A. BACKGROUND

28 U.S.C. § 1920 authorizes a judge or clerk to tax the following items as costs:

(1) Fees of the clerk and marshal;

(2) Fees of the court reporter for all or any part of the stenographic transcript necessarily obtained for use in the case;

(3) Fees and disbursements for printing and witnesses;

(4) Fees for exemplification and copies of papers necessarily obtained for use in the case;

(5) Docket fees under [28 U.S.C. § 1923];

(6) Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under [28 U.S.C. § 1828].

28 U.S.C. § 1821 specifies the rate of compensation for lay witnesses. In most cases these costs are routinely determined by the clerk.[31] See generally R. Peck, *Taxation of Costs—New Developments*, 43 F.R.D. 55 (1967); R. Peck, *Taxation of Costs in United States District Courts*, 37 F.R.D. 481 (1963). If there is a dispute, it is of course resolved by the courts. See, e.g., *Mikel v. Kerr*, 499 F.2d 1178, 1183 (10th Cir. 1974). See generally Anno., *Propriety under 28 USCS § 1920 and Rule 54(d) of the Federal Rules of Civil Procedure of Allowing Prevailing Party Costs for Copies of Depositions*, 50 A.L.R.Fed. 472 (1980).

▮▮▮ Federal trial judges may also award costs for items outside of those specified by the statutes under their general equitable powers.[32] The U.S. Supreme Court stated, however, that this power should be exercised "sparingly:"

> We do not read [F.R.Civ.P. 54(d)] as giving district judges unrestrained discretion to tax costs to reimburse a winning litigant for every expense he has seen fit to incur in the conduct of his case. Items proposed by winning parties as costs should always be given careful scrutiny. Any other practice would be too great a movement in the direction of some systems of jurisprudence that are willing, if not indeed anxious, to allow litigants costs so high as to discourage litigants from bringing lawsuits, no matter how meritorious they might in good faith believe their claims to be. Therefore, the discretion given district judges to tax

costs should be sparingly exercised with reference to expenses not specifically allowed by statute.

*Farmer v. Arabian American Oil Co.*, 379 U.S. 227, 235, 85 S.Ct. 411, 416, 13 L.Ed.2d 248 (1964). In *Euler v. Waller*, 295 F.2d 765, 766 (10th Cir. 1961), the Tenth Circuit stated:

> For compelling reasons of justice in exceptional cases allowances may be made of items of cost not authorized by the statutes.

There is considerable controversy on the issue of when the expenses of expert testimony should be awarded as costs in excess of the amounts provided for by the applicable statute, 28 U.S.C. § 1821. In *Henkel v. Chicago, St. Paul, Minneapolis, & Omaha Railway Co.*, 284 U.S. 444, 52 S.Ct. 223, 76 L.Ed. 386 (1932), the court held that a federal district court could not award expert witness fees as part of the costs in a Federal Employer's Liability Act action, even if a state statute authorized the award. The court reasoned that the comprehensive statutory scheme on costs indicated a congressional intent to disallow costs that were not specified in the statute. *Id.* at 446–47, 52 S.Ct. at 224–25. Other courts, including the Tenth Circuit, have also normally adhered to this rule and disallowed any expert witness fees exceeding the amounts specifically authorized by statute. See, e.g., *Cleverock Energy Corp. v. Trepel*, 609 F.2d 1358, 1363 (10th Cir. 1979), *cert. denied*, 446 U.S. 909, 100 S.Ct. 1836, 64 L.Ed.2d 261 (1980); *Union Carbide & Carbon Corp. v. Nisley*, 300 F.2d 561, 586–87 (10th Cir. 1961), *cert. dismissed sub nom.*, *Wade v. Union Carbide & Carbon Corp.*, 371 U.S. 801, 83 S.Ct. 13, 9 L.Ed.2d 46 (1962). See generally C. Wright

---

**31.** F.R.Civ.P. 54(d) provides for review of the clerks's decision by the trial judge.

**32.** I conclude that the Eleventh Amendment does not bar the awarding of such costs against the defendant state officials. See *Hutto v. Finney*, 437 U.S. 678, 694–97, 98 S.Ct. 2565, 2575–77, 57 L.Ed.2d 522 (1978).

I also conclude that the statute specifically authorizing that attorney fees may be included

"as part of the costs," 42 U.S.C. § 1988, does not authorize the attorney fee award to include all of a prevailing attorney's costs. Such reasoning would be circular: costs would include attorney fees which would include costs. See *Keyes v. School District No. 1, Denver, Colorado*, 439 F.Supp. 393, 417 (D.Colo.1977).

& A. Miller, *Federal Practice and Procedure* § 2678, at 236 (1973).

█ In exceptional circumstances courts have awarded expert witness fees in the absence of any specific authorizing statute. See, e.g., *Jones v. Diamond*, 636 F.2d 1364, 1382 (5th Cir. 1981) (en banc), *cert. dismissed sub nom., Ledbetter v. Jones*, 452 U.S. 959, 101 S.Ct. 3106, 69 L.Ed.2d 1033 (1981); *Welsch v. Likins*, 68 F.R.D. 589, 595–97 (D.Minn.), *aff'd*, 525 F.2d 987 (8th Cir. 1975); *Pennsylvania v. O'Neil*, 431 F.Supp. 700, 713 (E.D.Pa.1977), aff'd mem., 573 F.2d 1301 (3d Cir. 1978). Although the *Henkel* opinion would appear to bar such awards, the later *Farmer* opinion tacitly allows them. Considering *Farmer* and the previous quotation from *Euler v. Waller*, I conclude that expert witness fees are awardable in excess of the amounts authorized by 28 U.S.C. § 1821, but only under exceptional circumstances. This approach is consistent with that taken by Judge Finesilver in *Keyes v. School District No. 1, Denver, Colorado*, 439 F.Supp. 393, 418 (D.Colo.1977), where he found that there were exceptional circumstances and authorized the award of expert witness fees:

> Without the testimony of experts, the original claim could not have been established nor a viable desegregation plan determined. Therefore, we have awarded all costs associated with expert witness fees and expenses which have been identified as paid by plaintiffs and intervenors.

## B. FEES IN THIS CASE

█ Many of the expenses for which plaintiffs' attorneys seek reimbursement are those that are incidental to the normal practice of law. These expenses are normally overhead, reflected in the hourly rate that attorneys bill. Because there is no indication here that the hourly rates do not reflect this overhead, and because there is no indication that there are any exceptional

circumstances meriting a separate award, I do not award separately these incidental expenses. I therefore reject the claims for reimbursement of photocopying, postage, telephone, book, and secretarial expenses.

The National Prison Project seeks reimbursement for amounts paid to paralegals, $272.80 for Ms. Grasso (88 hours at $3.10 per hour), and $342.00 for Mr. Seligman (57 hours at $6.00 per hour). As I stated in the previous section, I believe that these expenses are properly chargeable when they are not already reflected in the attorney's hourly rate. Because they are not included in any attorney's rate here, they will be reimbursed separately.

█ Plaintiff's attorneys also request reimbursement for their travel expenses, particularly their transportation costs for travel between their residences and Denver. In *Pushkin v. Regents of the University of Colorado*, No. 81–1224 (10th Cir. Oct. 13, 1981), the prevailing party's attorney requested reimbursement of his travel expenses between his residence, Seattle, and Denver. A partial remand order [33] signed by the clerk stated, without any elaboration:

> The request for travel expenses from Seattle to Denver and return for [plaintiff's attorney], in the opinion of this Court, should be excluded.

Although this opinion does not state any authority, and in fact, is not even obviously that of the panel that heard the *Pushkin* appeal, I believe that until otherwise directed I should treat it as binding precedent. I therefore deny the requests by plaintiffs' attorneys for reimbursement of their travel expenses, including lodging and meal expenses. I note that in most cases this is a reasonable result. While defendants are obligated to pay a prevailing plaintiff's attorney fees, they should not be obligated to pay additional expenses merely because the plaintiff chose to retain out-of-state counsel. I doubt, however, that this is the prop-

---

33. The Tenth Circuit's opinion in this case appears at 658 F.2d 1327. This partial remand order is not published, however. Because of its apparent precedential value, I have included it as Appendix C to this opinion.

er result in this case, where in-state counsel with expertise in prison litigation simply may not have been available.

■ In contrast to the travel of attorneys from other states to Denver, I believe that it is proper to reimburse for expenses that plaintiffs' attorneys incurred traveling from Denver to Canon City. It would have been impossible to litigate this case without several trips to Canon City to interview witnesses and inspect the premises of Old Max. The application includes $1017.72 for expenses specifically related to such trips, which I will award.

■ In simple civil cases there is dispute over what deposition expenses are awardable as costs because 28 U.S.C. § 1920(2) and (4) only refer to transcripts and copies "necessarily obtained for use in the case." Some courts have accordingly only allowed an award of costs for depositions that were actually used at trial; other courts have refused to allow reimbursement for any copies because these were not absolutely necessary. See generally Anno., *Propriety under 28 USCS § 1920 and Rule 54(d) of the Federal Rules of Civil Procedure of Allowing Prevailing Party Costs for Copies of Depositions,* 50 A.L.R.Fed. 472 (1980). I conclude that all of the plaintiffs' depositions costs should be awarded here. In this complex case it would be unreasonable to find that certain depositions were not necessary because they were not actually used at trial; likewise it would be unreasonable to find that copies were not necessary. In truth, it would have constituted malpractice if the plaintiffs' attorneys had failed to take depositions. I therefore award plaintiffs' attorneys $10,930.21 for the stated costs of depositions.

■ As I noted above, expert witness fees are only awardable in exceptional circumstances. I hold that this case had such exceptional circumstances that it is proper to award expert witness fees. All of the

plaintiffs' experts were necessary for the effective prosecution of this case; none were unreasonably redundant. I therefore award the claimed expert witness fees of $18,719.70.

Plaintiffs' attorneys also requested $3946.05 for the services of the attorney who testified on their behalf about their attorney fee application. His time is not itemized. At trial he testified both on this case and the attorney fee application here, and also about the case law on attorney fees. As I have noted in this opinion, that case law is extremely ambiguous, unclear and sometimes contradictory. However, Mr. Kahn has already been awarded for the time he spent researching this attorney fee application. I hold that it is not proper to award an expert for the duplication of this effort. I therefore award only $1500 for this expert.[34]

In summary, I award the following costs:

| | |
|---|---|
| Paralegal fees | $614.80 |
| Travel expenses | 1,017.72 |
| Deposition costs | 10,930.21 |
| Expert Witness fees | 20,219.70 |
| Total | $32,782.43 |

## CONCLUSION

This opinion demonstrates the confusion in the current law of attorney fees, and why it is impossible for trial courts to render consistent opinions based on precedent. Based on an analysis of all of the relevant authority, this decision is made with full realization that reasonable minds must differ where guidance is scant, contradictory, or absent. Even so, it being the responsibility of trial judges to make a reasonable attorney fee award, for the reasons stated herein, based on the findings of facts and conclusions of law set forth,

IT IS ORDERED, pursuant to 42 U.S.C. § 1988, that the plaintiffs' attorneys shall be awarded, as part of their costs, an attor-

---

**34.** I stated, in note 25 supra, that I believe that attorneys should be discouraged from calling other attorneys as expert witnesses on the issue of attorney fees. However, because the defendants called attorneys as expert witnesses, the plaintiffs were left with no choice but to do the same. I have not made the reduction as an expression of the views set forth in note 25.

ney fee of $709,933.50. They shall also be awarded other costs of $32,782.43. The clerk shall therefore tax, in favor of the plaintiffs' attorneys and against the defendants, total costs of $742,715.93.

## APPENDIX A

### FEDERAL STATUTES AUTHORIZING THE AWARD OF ATTORNEYS' FEES *

Age Discrimination Act of 1975 (as amended by Pub.L. 95–478, § 401), 42 U.S.C., § 6104(e).

Age Discrimination in Employment Act of 1967, 29 U.S.C. § 626(b)

Agricultural Unfair Trade Practices, 7 U.S.C. § 2305(a), (c)

Alaska Native Claims Settlement Act, 43 U.S.C. § 1619

Alien Owners of Land, 48 U.S.C. § 1506

Atomic Energy Act of 1954, 42 U.S.C. § 2184

Bank Holding Company Act, 12 U.S.C. §§ 1975, 2607(d)(2)

Bankruptcy Act, 11 U.S.C. §§ 109, 205(c)(12), 632, 641, 642, 643, 644, 1975

Bankruptcy Reform Act (Pub.L. 95–598), 11 U.S.C. §§ 303(i), 330(a), 363(n), 503(b)

Civil Rights Act of 1964, Title II, 42 U.S.C. § 2000a–3(b)

Civil Rights Act of 1964, Title VII, 42 U.S.C. § 2000e–5(k)

Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988

Civil Service Reform Act of 1978 (Pub.L. 95–454, §§ 205, 702), 5 U.S.C. §§ 5596(b)(1), 7701(g)

Clayton Act, 15 U.S.C. § 15

Clean Air Act (as amended by Pub.L. 95–95), 42 U.S.C. §§ 7413(b), 7604(d), 7607(f), 7622(b)(2)(B), (e)(2)

Clean Air Act Amendments of 1970, 42 U.S.C. § 1857h–2(d)

Coal Mine Safety Act, 30 U.S.C. § 938(c)

Coast Guard Act, 14 U.S.C. § 431(c)

Commodity Futures Trading Commission Act of 1974, 7 U.S.C. § 18(f), (g)

Communications Act of 1934, 47 U.S.C. §§ 206, 407

Consumer Leasing Act, 15 U.S.C. § 1667b(a)

Consumer Product Safety Act, 15 U.S.C. §§ 2059(e)(4), 2060(c), 2072(a), 2073

Copyright Act, 17 U.S.C. § 505

Criminal Code, 18 U.S.C. §§ 3006A(d), 3495

Deepwater Ports Act, 33 U.S.C. § 1515(d)

Economic Opportunity Act of 1964, 42 U.S.C. § 2701 et seq.

Electronic Fund Transfer Act (Pub.L. 95–630, Title XX), 15 U.S.C. § 1693m(a), (f)

Emergency School Aid Act of 1972, 20 U.S.C. § 1617

Employee Retirement Income Security Act, 29 U.S.C. § 1132(g)

Endangered Species Act, 16 U.S.C. § 1540(g)(4)

Energy Policy and Conservation Act, 42 U.S.C. § 6305(d)

Energy Reorganization Act of 1974 (as amended by Pub.L. 95–601), 42 U.S.C. § 5851(b)(2)(B), (e)(2)

Equal Access to Justice Act, 5 U.S.C. § 504, 28 U.S.C. § 2412

Equal Credit Opportunity Act, 15 U.S.C. § 1691e(d)

Ethics in Government Act of 1978 (Pub.L. 95–521, § 710(d), 2 U.S.C. § 288i(d)

Fair Credit Reporting Act, 15 U.S.C. §§ 1681n, o

Fair Debt Collection Practices Act (Pub.L. 95–109, § 813–(a)), 15 U.S.C. § 1692k

Fair Housing Act of 1968, 42 U.S.C. § 3612(c)

Fair Labor Standards Act, 29 U.S.C. § 216(b)

Federal Contested Election Act, 2 U.S.C. § 396

Federal Credit Union Act, 12 U.S.C. § 1786(o)

Federal Deposit Insurance Act, 12 U.S.C. § 1818(n)

Federal Employment Compensation for Work Injuries, 5 U.S.C. § 8127

* Reprinted from the Federal Attorney Fee Awards Reporter, Vol. 4, No. 6, Oct., 1981, with permission of Law and Business, Inc., Harcourt

Brace Jovanovich, Publishers, c 1981 Law and Business, Inc., All rights reserved.

Federal Mine Safety and Health Act, 30 U.S.C. § 815(c)(3) (added by Pub.L. 95–164), 30 U.S.C. § 938(c)

Federal Power Act (as amended by Pub.L. 95–617, § 212), 16 U.S.C. § 825q1–(b)(2)

Federal Rules of Appellate Procedure, App. Rule 38 (28 U.S.C.)

Federal Rules of Civil Procedure, App. Rules 37, 56(g) (28 U.S.C.)

Federal Trade Commission Improvement Act, 15 U.S.C. §§ 57a(h)(1)

Federal Water Pollution Control Act Amendment of 1972, 33 U.S.C. § 1365(d)

Fees and Costs, 28 U.S.C. § 1912

Foreign Intelligence Surveillance Act of 1978 (Pub.L. 95–511, § 110), 50 U.S.C. § 1810

Freedom of Information Act, 5 U.S.C. § 552(a)(4)(E)

Government in the Sunshine Act, 5 U.S.C. § 552b(i)

Guam Organic Act (Pub.L. 95–134, § 204), 48 U.S.C. § 1424c(f)

Hart-Scott Rodino Antitrust Improvements Act of 1976, 15 U.S.C. §§ 15c(a)(2), (d)(2), 26

Hobby Protection Act, 15 U.S.C. § 2102

Home Owners Loan Act of 1933, 12 U.S.C. § 1464(d)(8)

Housing and Community Development Amendments of 1979 (Pub.L. 96–153, § 405) 15 U.S.C. § 1709

Indian Claims Commission Act, 25 U.S.C. §§ 70n, 70V–3(a), (added by Pub.L. 95–69)

Indian Contract Act, 25 U.S.C. §§ 81, 82, 82(a), 85

Indian Reorganization Act, 25 U.S.C. § 476

International Claims Settlement Act, 22 U.S.C. §§ 1623(f), 1631(j), 1641(p), 1642(m), 1643(k), 1644*l*

Interstate Commerce Act, 49 U.S.C. §§ 8, 15(9), 16(2), 20(12), 94, 322(b)(2), 908, 1017(b)(2)

Japanese-American Evacuation Claims Act of 1948, 50 U.S.C.App. § 1985

Jewelers Hall-Mark Act, 15 U.S.C. § 298(b), (c), (d)

Jury System Improvements Act of 1978 (Pub.L. 95–572, § 6), 28 U.S.C. § 1875(d)(2)

Labor-Management Reporting and Disclosure Act of 1959, 29 U.S.C. §§ 431(c), 501(b)

Legal Services Corporation Act, 42 U.S.C. § 2996e(f)

Longshoremen's and Harbor Worker's Compensation Act, 33 U.S.C. §§ 399(e)(1), 928

Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(d)(2)

Marine Protection, Research, and Sanctuaries Act, 33 U.S.C. § 1415(g)(4)

Merchant Marine Act of 1936, 46 U.S.C. § 1227

Mexican-American Chamizal Convention Act of 1946, 22 U.S.C. §§ 277d–21

Military Personnel and Civilian Employees Claims Act of 1964, 31 U.S.C. § 243

Mobile Home Construction and Safety Standards Act, 42 U.S.C. §§ 5412(b)

Motor Vehicle Information and Cost Savings Act, 15 U.S.C. §§ 1918(a), 1989(a)

National Guard Act, 32 U.S.C. § 334

National Housing Act, 12 U.S.C. § 1730(m)(3)

National Traffic and Motor Vehicle Safety Act of 1966, 15 U.S.C. § 1400(b)

Natural Gas Pipeline Safety Act, 49 U.S.C. § 1686(e)

Noise Control Act of 1972, 42 U.S.C. § 4911(d)

Norris-LaGuardia Act 29 U.S.C. § 107(e)

Ocean Dumping Act, 33 U.S.C. § 1415(g)(4)

Omnibus Crime Control and Safe Streets Act of 1968, 42 U.S.C. § 3766(c)(4)(B)

Organized Crime Control Act of 1970, 18 U.S.C. § 1964(c)

Outer Continental Shelf Lands Act (as amended by Pub.L. 95–372), 43 U.S.C. § 1349(a)(5), (b)(2)

Packers and Stockyards Act, 7 U.S.C. § 210(f)

Patent Infringement, 35 U.S.C. § 285

Perishable Agricultural Commodities Act, 7 U.S.C. § 499g(b), (c)

Petroleum Marketing Practices Act (Pub.L. 95–297, § 105(d), 15 U.S.C. § 2805(d)(1), (3)

Plant Variety Act, 7 U.S.C. § 2565

Privacy Act, 5 U.S.C. § 522a(g)(2)(B), (3)(B), (4)

Public Utility Holding Company Act of 1935, 15 U.S.C. § 79g(d)(4), 79j(b)(2)

Public Utility Regulatory Policies Act of 1978 (Pub.L. 95–617, § 122), 16 U.S.C. § 2632(a)

Railroad Revitalization and Reform Act, 45 U.S.C. § 854(g)

Railroad Unemployment Insurance Act, 45 U.S.C. § 355(i)

Railway Labor Act, 45 U.S.C. § 153(p)

Real Estate Settlement Procedures Act of 1974, 12 U.S.C. § 2607(d)

Rehabilitation Act of 1973 (as amended by Pub.L. 95–602, § 120), 29 U.S.C. § 794a(b)

Right to Financial Privacy Act of 1978 (Pub.L. 95–630, §§ 1117(a), 1118), 12 U.S.C. §§ 3417(a), 3418

Safe Drinking Water Act, 42 U.S.C. §§ 300j–8(d), 9(i)(2)(B)(ii)

Securities Act of 1933, 15 U.S.C. § 77k(e)

Securities Exchange Act of 1934, 15 U.S.C. § 78i(e), 78r(a)

Securities Investor Protection Act, 15 U.S.C. § 78eee(b) (Pub.L. 95-283, § 7(b)(5))

Servicemen's Group Life Insurance Act, 38 U.S.C. § 784(g)

Sex Discrimination Prohibition (Title IX of Pub.L. 92–318), 20 U.S.C. § 1681 et seq. See 42 U.S.C. § 1988

Social Security Act Amendments of 1965, 42 U.S.C. § 406

Solid Waste Disposal Act, 42 U.S.C. §§ 6971(c), 6972(e)

State and Local Fiscal Assistance Amendment of 1976, 31 U.S.C. § 1244(e)

Surface Mining Control and Reclamation Act (Pub.L. 95–87), 30 U.S.C. §§ 1270(d), (f), 1275(e), 1293(c)

Tax Reform Act of 1976, 26 U.S.C. § 6110(i)(2)

Toxic Substances Control Act, 15 U.S.C. §§ 2605(c)(4)(A), 2618(d), 2619(c)(2), 2620(b)(4)(C), 2622(b)(2)(B)

Trademark Act, 15 U.S.C. § 1117

Trading With the Enemy Act, 50 U.S.C. App. § 20

Trust Indenture Act, 15 U.S.C. § 77ooo(e), www(a)

Truth in Lending Act, 15 U.S.C. § 1640(a)

Unfair Competition Act, 15 U.S.C. § 72

Uniform Relocation Assistance and Real Property Acquisition Policies Act, 42 U.S.C. § 4654

United States as a Party, 28 U.S.C. § 2412

Veterans' Benefits Act, 38 U.S.C. § 3404(c)

Voting Rights Amendment of 1975, 42 U.S.C. § 1973*l*(e)

War Hazards Compensation Act, 42 U.S.C. § 1714

Water Pollution Prevention and Control Act, 33 U.S.C. §§ 1365(d), 1367(c)

Wire Interception Act, 18 U.S.C. § 2520

## APPENDIX B

### COLORADO STATUTES AWARDING ATTORNEYS' FEES

Consumer Credit Code; Remedies and Penalties.

| | |
|---|---|
| § 5–5–103.5(1) | Insecurity and impaired collateral. |
| § 5–5–108(5) | Unconscionability; inducement by unconscionable conduct; unconscionable debt collection. |
| § 5–5–202(8) | Effect of violations on rights of parties. |
| § 5–5–203(1)(b) | Civil liability for violation of disclosure provisions. |
| § 5–5–206 | Civil liability for discrimination. |

Consumer and Commercial Affairs; Consumer Protection Act.

| | |
|---|---|
| § 6–1–113 | Damages. |

Corporations and Associations; Trademarks

| | |
|---|---|
| § 7–70–108(3) | Action for cancellation. |
| § 7–70–110 | Fraudulent registration. |
| § 7–70–111(2) | Infringement-civil action. |

Labor and Industry; Labor Relations, Generally.

| | |
|---|---|
| § 8–2–107 | Workmen engaged by false representation to recover damages. |

Labor and Industry; Wages.

| | |
|---|---|
| § 8–4–114 | Employee may recover attorney fee. |

Labor and Industry; Contractors and Lessees.

| | |
|---|---|
| § 8–48–101(3)(d)(I) | Lessor or contractor—out deemed employer —liability recovery. |

Insurance; Regulation or Insurance Companies.

| | |
|---|---|
| § 10–3–1005 | Unauthorized foreign insurer. |

Insurance; Property and Casualty Insurance.

| | |
|---|---|
| § 10–4–708(1) | Prompt payment by insurer of direct benefits. |

Financial Institutions; Safety Deposit Facilities.

| | |
|---|---|
| § 11–46–109 | Nonpayment of rent. |

Financial Institutions; Safety Deposit Facilities.

| | |
|---|---|
| § 11–51–125(1) | Civil Liabilities. |

# 758

Professions and Occupations; Automobiles.

§ 12–6–122(2) Right of action for loss.
§ 12–6–122(3) Right of action for loss.

Professions and Occupations; Medical Practice.

§ 12–36–129(4)(b) Violations—penalties.

Professions and Occupations; Indian Arts and Craft Sales.

§ 12–44.5–108 Right of action—damages.

Professions and Occupations; Mobile Homes.

§ 12–51.5–123 Right of action for loss.

Professions and Occupation; Pawnbrokers.

§ 12–56–115 Commission contracts void—penalty.

Professions and Occupation; Racing

§ 12–60–112(3) Liability insurance—bond.

Courts and Court Procedure; County Courts.

§ 13–6–408 Counterclaims exceeding jurisdiction of small claims court—procedures—sanctions for improper assertion.

Courts and Court Procedure; Costs—Civil Actions.

§ 13–16–121 Costs allowed to defendants who prevail against public entities.

Courts and Court Procedure; Attorney Fees.

§ 13–17–101 Frivolous or groundless actions.
§ 13–17–102(1)(a) Procedure for determining reasonable fee—judicial discretion.
§ 13–17–103 Fees on appeal.
§ 13–17–104 Fee arrangements between attorney and client.
§ 13–17–105 Stipulation as to fees.
§ 13–17–106 Applicability.

Courts and Court Procedure; Damages.

§ 13–21–107 Damages for destruction by minors.
§ 13–21–109(1) Recovery of damages for insufficient funds or no account instruments.

Courts and Court Procedure; Forcible Entry and Detainer—General Provisions.

§ 13–40–115(2) Judgment—writ of restitution.
§ 13–40–123 Plaintiff's damages.

Courts and Court Procedure; Uniform Jury Selection and Service Act.

§ 13–71–118(3) Protection of jurors' employment.

Domestic Matters; Uniform Dissolution of Marriage Act.

§ 14–13–108(7) Inconvenient forum.
§ 14–13–109(3) Jurisdiction declined by reason of conduct.
§ 14–13–116(2) Enforcement of custody decree in another state.

Probate, Trusts, and Fiduciaries; Probate of Wills and Administration.

§ 15–12–720 Expenses in estate litigation.

Criminal Proceedings; Authority of a Person not a Peace Officer to make an Arrest.

§ 16–3–203 Preventing a crime—reimbursement.

Criminal Proceedings, Preservation of the Peace.

§ 16–14–401(5) Recognizance to prevent offense.

Criminal Code; Offenses against Property.

§ 18–4–405 Rights in stolen property.

Government—State; Rule-making and Licensing Procedures by State Agencies.

§ 24–4–106(8) Judicial review.

Government—State; State Personnel System.

§ 24–50–125.5(1) Recovery for improper state personnel system action.

Government—State; Relocation Assistance and Land Acquisition Policies.

§ 24–56–115 Litigation expenses.
§ 24–56–116 Inverse condemnation proceedings.

Government—State; Public Records.

§ 24–72–204(5) Allowance or denial of inspection—grounds—procedure—appeal.
§ 24–72–305(7) Inspection criminal justice records.
§ 24–72–307(4) Challenge to accuracy and completeness—appeal.

Institutions; Care and Treatment of the Developmentally Disabled.

§ 27–10.5–134 Civil action and attorney fees.

Military and Veterans; National Guard.

§ 28–3–503 Actions against military personnel—cost bond.

Government—County; Fees—General.

§ 30–1–107 Penalty for violation—duties.

Government—Municipal; Other Judicial Proceedings.

§ 31–10–1402(2) Correction of errors.

Government—Municipal; Annexation—Consolidation—Disconnection.

§ 31–12–107(5) Petitions for annexation and annexation elections.

Government—Municipal; Public Improvements (Cemetaries).

§ 31–25–704 Hearing and decree.

Special Districts; Water and Sanitation Districts.

§ 32–4 522(2)(b) Rates and service charges.
§ 32–4–545(2) Misdemeanors and civil rights.

Special Districts; Regional Transportation District Act.

§ 32–9–106(2) Misdemeanors.

Special District, Urban Drainage and Flood Control Act.

§ 32–11–306(2)(b) Service charges.
§ 32–11–643(2) Acceleration upon delinquency.
§ 32–11–816 Civil Rights.

Mineral Resources; Colorado Surface Coal Mining Reclamation Act.

§ 34–33–124(5) Reviewed by the board.
§ 34–33–128(4) Judicial Review.
§ 34–33–135(4) Civil Actions.
§ 34–33–135(6) Civil Actions.

Agriculture; Colorado Bee and Bee Products Act.

§ 35–25–109(3) Labeling of adulterated or artificial products—enforcement.

Agriculture; Marketing Act 1939.

§ 35–28–116(9) Administration and enforcement.

Water and Irrigation; Colorado River Conservation District.

§ 37–46–147(2)(b) Rents and charges.

Water and Irrigation; Southwestern Water Conservation District.

§ 37–48–189(2)(b) Rents and charges.

Water and Irrigation; Responsibility of User or Owner.

§ 37–84–125 Receipt of too much water.

Water and Irrigation; Charge for Delivery of Water.

§ 37–85–108(2) Bonus deemed an extortionate rate.

Water and Irrigation; Water Right Determination and Administration.

§ 37–92–503(1)(b)     Enforcement—injunction
§ 37–92–504     Triple damages.

Property—Real and Personal; Proceedings by Cities and Towns.

§ 38–6–212     Costs—Compensation.

Property—Real and Personal; Tenants and Landlords.

§ 38–12–103(3)(a)     Return of security deposits.
§ 38–12–209(3)     Entry fees prohibited—entry fee defined —security deposit—court costs.

Property—Real and Personal; Lien on Personal Property.

§ 38–20–107(2)     Commencement of foreclosure action

Property—Real and Personal; General Mechanics' Liens.

§ 38–22–128     Excessive amounts claimed.

Property—Real and Personal; Hospital Liens.

§ 38–27–103     Enforcement of lien and limitation of action.

Property—Real and Personal; Torrens Title Registration Act.

§ 38–36–185(2)     Adverse claim—filed—hearing—costs.

Property—Real and Personal; Sales on Execution—Lien Foreclosures—Redemptions.

§ 38–39–118(1)(a)     When default is non-payment.

Property—Real and Personal; Oil, Gas, and Mining Leases.

§ 38–42–105     Action for surrender of lease—damages.

Vehicles and Traffic; Motor Vehicle Financial Responsibility Law.

§ 42–6–208(1)(b)     Private civil action.

Vehicles and Traffic; Motor Vehicle Repair Act.

§ 42–11–109(3)     Penalties—civil action.

# APPENDIX C

SEPTEMBER TERM—October 9, 1981

Before Honorable William E. Doyle, Honorable James K. Logan, Circuit Judges, and Honorable George Templar, District Judge*

| | |
|---|---|
| JOSHUA R. PUSHKIN, M.D.,<br>    Plaintiff-Appellee,<br><br>    vs.<br><br>THE REGENTS OF THE UNIVERSITY OF COLORADO; THE UNIVERSITY OF COLORADO; THE UNIVERSITY OF COLORADO UNIVERSITY HOSPITAL, also known as THE UNIVERSITY OF COLORADO HEALTH SCIENCES CENTER; UNIVERSITY OF COLORADO PSYCHIATRIC HOSPITAL; and DOUGLAS CARTER, M.D.,<br><br>    Defendants-Appellants. | No. 81–1224<br>(D.C. No. 80–K–1097) |

This matter comes on for consideration of appellee's motion for costs, including attorney fees, filed on September 18, 1981.

Upon consideration whereof, it is the order of the Court as follows:

1. The mandate issued to the United States District Court for the District of Colorado on September 28, 1981, is hereby recalled.

2. The captioned appeal is partially remanded to the United States District Court for the District of Colorado for a hearing and determination of the issue of attorney's fees and costs on appeal.

The request for travel expenses from Seattle to Denver and return for Mr. Engdahl, in the opinion of this Court, should be excluded.

3. Upon determination of attorney's fees and costs, a supplemental record should be prepared and forwarded to this Court.

/s/ Howard K. Phillips
HOWARD   K.   PHILLIPS,
Clerk

* Of the District of Kansas, sitting by designation.